**In re ESBON GRAIN CO., INC., Debtor.**

**Bankruptcy No. 85–10364.**

United States Bankruptcy Court, D. Kansas.

Nov. 27, 1985.

---

Robert E. Nugent, Hutchinson, Kan., pro se.

Martin R. Ufford, for debtor, Esbon Grain Co., Inc.

James L. Bush, Smith Center, Kan., for claimant, First Nat. Bank of Smith Center, Kansas.

### MEMORANDUM OF DECISION

ROBERT B. MORTON, Bankruptcy Judge.

### NATURE OF THE CASE

Procedurally, the matter is before the Court on the Trustee's objection to the secured claim of The First National Bank of Smith Center, Kansas (Bank). The subject of the controversy is grain [proceeds] in storage at debtor's facility in quantity insufficient to fully satisfy claim of Bank and the claims of grain depositors. In a broad sense the issue calls for a determination of the rights of grain depositors as opposed to the rights of the holder of a

security interest in stored grain belonging to the warehouseman.

## FACTS

Debtor filed for Chapter 7 relief on February 28, 1985. Approximately two years earlier debtor had executed security agreements and financing statements creating a lien in favor of Bank by way of a security interest in "all grain, or contract rights now owned or hereafter acquired." Debtor was in the business of buying, selling and storing grain and related supplies at a facility within the city of Esbon, Kansas. Both prior and subsequent to the execution of the security agreement debtor, in the ordinary course of business, received grain delivered by grain producers and issued scale tickets and warehouse receipts therefor. Many of the warehouse receipts specified "open storage." That designation was commonly understood as permitting debtor to commingle grain of that particular producer along with grain owned by debtor and/or other grain depositors. In instances where producers desired to sell their grain outright, debtor paid the producer upon delivery and thereby acquired ownership of the deposited grain. Transactions of the latter type usually were financed with funds provided by Bank under the security agreements. As of the petition filing date the quantity of grain on hand in storage was substantially less than the total represented by outstanding receipts, scale tickets and lien pledges to Bank.

## MEMORANDUM

The issues at hand appear to be of first impression under the 1984 Amendments to the Bankruptcy Code. No decisional law has been cited or found. Consequently considerable weight must be given to the legislative history, particularly the problems Congress sought to alleviate by the legislation. As a general premise for the inquiry the Court accepts counsels' statement that customary grain storage business practices were followed in this instance: e.g., the producer deposits the grain in the elevator, receives a warehouse receipt or scale ticket evidencing the producer's actual ownership of the grain and pays a storage fee. In return, the elevator agrees to deliver (equivalent) grain upon the owner's demand. Generally there is a commingling of the stored grain so that the holders of warehouse receipts become tenants in common to the extent of their proportionate respective shares of grain in storage.[1] In other instances the grain producer sells outright to the elevator and takes warehouseman's check or draft in payment. There may be a time lag between the sale and payment.

Problems are immediately created when the elevator files for protection under the Bankruptcy Code. Thereupon a particular grain depositor is denied his right to a physical redelivery of like grain in kind because the entire amount in storage is "property of the estate"[2] by virtue of the debtor's possession and lien for storage fees. It then falls to the Bankruptcy Court to determine the respective grain ownership and lien rights by application of appropriate state law.[3] It is evident that, in the eyes of Congress, some of those decisions under the 1978 Code produced unfair results. The 1984 Amendments of sections 546(d), 557 and 507(a)(5) were seen as amelioratory changes. In that order those 1984 enactments are the following:

§ 546 Limitations on avoiding powers.

(d) In the case of a seller who is a producer of grain sold to a grain storage facility, owned or operated by the debtor, in the ordinary course of such seller's business (as such terms are defined in section 557 of this title) or in the case of a United States

1. See *United States v. Luther*, 225 F.2d 499 (10th Cir.1955), *cert. denied*, 350 U.S. 947, 76 S.Ct. 321, 100 L.Ed. 825 (1956).

2. See *In re Missouri*, 647 F.2d 768, 774 (8th Cir.1981), *cert. denied*, 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982).

3. *Id.* See also *In re Clemens*, 472 F.2d 939 (6th Cir.1972); *In re Universal Medical Services, Inc.*, 460 F.2d 524 (3rd Cir.1972).

fisherman who has caught fish sold to a fish processing facility owned or operated by the debtor in the ordinary course of such fisherman's business, the rights and powers of the trustee under sections 544(a), 545, 547, and 549 of this title are subject to any statutory or common law right of such producer or fisherman to reclaim such grain or fish if the debtor has received such grain or fish while insolvent, but—

(1) such producer or fisherman may not reclaim any grain or fish unless such producer or fisherman demands, in writing, reclamation of such grain or fish before ten days after receipt thereof by the debtor; and

(2) the court may deny reclamation to such a producer or fisherman with a right of reclamation that has made such a demand only if the court secures such claim by a lien.

§ 557. Expedited determination of interests in, and abandonment or other disposition of grain assets.

(a) This section applies only in a case concerning a debtor that owns or operates a grain storage facility and only with respect to grain and the proceeds of grain. This section does not affect the application of any section of this title to property other than grain and proceeds of grain.

(b) In this section—

(1) "grain" means wheat, corn, flaxseed, grain sorghum, barley, oats, rye, soybeans, other dry edible beans, or rice;

(2) "grain storage facility" means a site or physical structure regularly used to store grain for producers, or to store grain acquired from producers for resale; and

(3) "producer" means an entity which engages in the growing of grain.

(c)(1) Notwithstanding sections 362, 363, 365, and 554 of this title, on the court's own motion the court may, and on the request of the trustee or an entity that claims an interest in grain or the proceeds of grain the court shall, expedite the procedures for the determination of interests in and the disposition of grain and the proceeds of grain, by shortening to the greatest extent feasible such time periods as are otherwise applicable for such procedures and by establishing, by order, a timetable having a duration of not to exceed 120 days for the completion of the applicable procedure specified in subsection (d) of this section. Such time periods and such timetable may be modified by the court, for cause, in accordance with subsection (f) of this section.

(2) The court shall determine the extent to which such time periods shall be shortened, based upon—

(A) any need of an entity claiming an interest in such grain or the proceeds of grain for a prompt determination of such interest;

(B) any need of such entity for a prompt disposition of such grain;

(C) the market for such grain;

(D) the conditions under which such grain is stored;

(E) the costs of continued storage or disposition of such grain;

(F) the orderly administration of the estate;

(G) the appropriate opportunity for an entity to assert an interest in such grain; and

(H) such other considerations as are relevant to the need to expedite such procedures in the case.

(d) The procedures that may be expedited under subsection (c) of this section include—

(1) the filing of and response to—

(A) a claim of ownership;

(B) a proof of claim;

(C) a request for abandonment;

(D) a request for relief from the stay of action against property under section 362(a) of this title;

(E) a request for determination of secured status;

(F) a request for determination of whether such grain or the proceeds of grain—

(i) is property of the estate;

(ii) must be turned over to the estate; or

(iii) may be used, sold, or leased; and

(G) any other request for determination of an interest in such grain or the proceeds of grain;

(2) the disposition of such grain or the proceeds of grain, before or after determination of interests in such grain or the proceeds of grain, by way of—

(A) sale of such grain;

(B) abandonment;

(C) distribution; or

(D) such other method as is equitable in the case.

(3) subject to sections 701, 702, 703, 1104, and 1302 of this title, the appointment of a trustee or examiner and the retention and compensation of any professional person required to assist with respect to matters relevant to the determination of interests in or disposition of such grain or the proceeds of grain; and

(4) the determination of any dispute concerning a matter specified in paragraph (1), (2), or (3) of this subsection.

(e)(1) Any governmental unit that has regulatory jurisdiction over the operation or liquidation of the debtor or the debtor's business shall be given notice of any request made or order entered under subsection (c) of this section.

(2) Any such governmental unit may raise, and may appear and be heard on, any issue relating to grain or the proceeds of grain in a case in which a request is made, or an order is entered, under subsection (c) of this section.

(3) The trustee shall consult with such governmental unit before taking any action relating to the disposition of grain in the possession, custody, or control of the debtor or the estate.

(f) The court may extend the period for final disposition of grain or the proceeds of grain under this section beyond 120 days if the court finds that—

(1) the interests of justice so require in light of the complexity of the case; and

(2) the interests of those claimants entitled to distribution of grain or the proceeds of grain will not be materially injured by such additional delay.

(g) Unless an order establishing an expedited procedure under subsection (c) of this section, or determining any interest in or approving any disposition of grain or the proceeds of grain, is stayed pending appeal—

(1) the reversal or modification of such order on appeal does not affect the validity of any procedure, determination, or disposition that occurs before such reversal or modification, whether or not any entity knew of the pendency of the appeal; and

(2) neither the court nor the trustee may delay, due to the appeal of such order, any proceeding in the case in which such order is issued.

(h)(1) The trustee may recover from grain and the proceeds of grain the reasonable and necessary costs and expenses allowable under section 503(b) of this title attributable to preserving or disposing of grain or the proceeds of grain, but may not recover from such grain or the proceeds of grain any other costs or expenses.

(2) Notwithstanding section 326(a) of this title, the dollar amounts of money specified in such section include the value, as of the date of disposition, of any grain that the trustee distributes in kind.

(i) In all cases where the quantity of a specific type of grain held by a debtor operating a grain storage facility exceeds ten thousand bushels, such grain shall be sold by the trustee and the assets thereof distributed in accordance with the provisions of this section.

§ 507  Priorities.

(a) The following expenses and claims have priority in the following order:

(5) Fifth, allowed unsecured claims of persons—

(A) engaged in the production or raising grain, as defined in section 557(b)(1) of this title, against a debtor who owns or operates a grain storage

facility, as defined in section 557(b)(2) of this title, for grain or the proceeds of grain, or

(B) engaged as a United States fisherman against a debtor who has acquired fish or fish produce from a fisherman through a sale or conversion, and who is engaged in operating a fish produce storage or processing facility—

but only to the extent of $2,000 for each such individual.

There is practically no legislative history specifically attributed to those 1984 Code sections 546(d), 557 and 507(a)(5). However they are essential counterparts of sections 236, 235 and 237, respectively, of the Omnibus Bankruptcy Improvements Act of 1983 passed by the Senate as S. 445. The latter was the product of extensive Senate hearings and findings which provide an appropriate and useful guide for an interpretation of the 1984 enactments.

Following is an excerpt from S.Rep. No. 98–65, 98th Cong., 1st Sess., p. 25, The Omnibus Bankruptcy Improvements Act of 1983, Report of the Committee on the Judiciary United States Senate:

Testimony before the Subcommittee on the Courts established that the following problems, encountered in the James Brothers cases, have repeatedly hindered the proper distribution of farm produce located in storage facilities that are the subject of proceedings in bankruptcy:

(1) delay in abandonment of crop assets owned by parties who have delivered such assets to the debtor upon a contract of bailment, with delays in excess of two years not uncommon;

(2) conflicts in jurisdiction between the bankruptcy courts and state agencies charged with the responsibility of supervising the liquidation of insolvent storage facilites [sic];

(3) *the requirements of present law which mandate that owners of crop assets held by the debtor solely on the basis of his status as a bailee must share grain assets held by the trustee in bankruptcy on a pro rata basis*

*with any creditor holding a security interest in assets of a similar type which are owned by the debtor, such that the bailors of such storage contract crop assets have the value of their property diminished for the benefit of such creditors when there is a shortage of produce on hand;*

(4) *the unprotected status, as unsecured creditors in bankruptcy, of farmers who have sold crops to a farm produce storage facility but have not received payment for that crop;*

(5) *the reluctance of some courts to accept warehouse receipts and scale tickets, the principle [sic] documents used in warehouse business to establish record of ownership of crop assets stored in warehouse facilities on bailment contracts, as evidence of ownership in bankruptcy abandonment proceedings;* and

(6) the tendency of certain bankruptcy courts to attach bailed property for the payment of trustees fees and expenses incurred in performing services unrelated to that bailed property.

*Id.* (Emphasis supplied by the Court). There is an obvious correlation of paragraph (4) above with 1984 section 546(d) and of paragraphs (3) and (5) with 1984 sections 557 and 507(a)(5). The Senate report further states that the Committee bill would accomplish the following to alleviate the above-described problems:

(1) The bill would require bankruptcy courts, upon a request in a case involving a grain storage facility, to establish a timetable for the performance of all judicial and administrative functions in connection with the abandonment or other distribution of grain assets from such a facility;

(2) *The bill would require the court to distribute grain assets or the proceeds of such assets first to producers who have merely stored their grain in such a facility upon a contract of bailment;*

(3) The bill mandates distribution of grain within 120 days of the filing in bankruptcy except in cases involving special circumstances requiring more time.

(4) The bill contains measures requiring the court to allow state or federal agencies charged with the responsibility of liquidating farm produce storage facilities to participate in the distribution process;

(5) *The bill contains measures which would strengthen present provisions of the Code allowing a right of reclamation to producers who have sold goods to a debtor in bankruptcy who have not received payment;*

(6) *The bill contains measures requiring the bankruptcy court to accept valid warehouse receipts and scale tickets as proof of ownership of crop assets possessed by the debtor upon contracts of bailment where they were issued for that purpose;*

(7) The bill incorporates measures which would act to prohibit an involuntary bailment of crop assets owned by producers to a farm produce storage facility which is the subject to reorganization proceedings under Chapter 11 of the Bankruptcy Act; and

(8) *The bill grants farm producers a priority position in the distribution of assets of the bankrupt to general unsecured creditors when those farm producers have suffered a loss as a result of the sale or conversion of farm produce to or by a debtor operating a storage facility, after trustee and court expenses, wages of employees, and pension plan payments.*

*Id.*, at 26. (Emphasis supplied by the Court.) Once again there is an identification of those comments with the 1984 amendments: paragraph (5) with section 546(d); paragraphs (2) and (6) with section 557; and paragraph (8) with section 507(a)(5).

The Bill referred to in the Senate report was later passed, with very little change, by Congress as the 1984 Amendments. Consequently, as indicated above, the legislative history of Senate Bill 445, 98th Cong. 1st Sess., seems material in interpreting the 1984 Amendments.

■ Bank here advances the argument that lien rights against the warehouseman's own [stored] grain are on an equal footing with the rights of grain depositors holding warehouse receipts or scale tickets, *ergo* all share pro rata where there is an overall shortage of grain in the facility. That legal proposition is characterized in the above Senate report as a problem requiring correction. S.Rep., *supra*, p. 25, ¶ (3). And regardless of whether it is a correct statement of non-bankruptcy law in all jurisdictions the proposition is supplanted and overridden by the 1984 amendments to the Code. By reason of that legislation a grain producer/depositor's rights no longer may be treated on a parity with those of a secured creditor. The expedited procedures of section 557 were intended to preclude any such "forced sharing" by producer/depositor with secured lenders. Bankruptcy courts are mandated to order distribution of the stored grain (or proceeds) to the producer/depositor *before* distribution to debtor's secured creditors. And it seems intended that that sequential priority applies in instances of shortfall: After payment of trustee costs all grain is committed to the bailment claims of producer/depositors, thus shifting the loss to debtor's secured creditors. This result is not inconsistent with the concept that the assignee of the debtor has no more rights than the debtor.[4]

Under section 557, the procedural frameworks within which such expedited distributions may be ordered include—but are

---

**4.** A warehouseman who puts his own fungible goods into a mass of similar deposited goods becomes as to such goods a tenant in common of the mass. However, if a deficiency occurs in the amount of property in the mass, from any cause for which the warehouseman is responsible, the remaining goods are appropriated for the benefit of holders of the other warehouse receipts. A similar rule has been applied to an assignee of a warehouseman.... 78 Am.Jur.2d *Warehouses* ¶ 183 at 302–303 (1975).

not limited to[5]—claims of ownership, proofs of claim, requests for abandonment, relief from the stay, determination of secured status, determination of whether the grain (or proceeds) is property of the estate, or whether the grain must be turned over to the estate or "may be used, sold or leased" [sic]. The clear purpose, however obliquely expressed, seems to be that of allowing producer/depositors to prove up ownership and receive distribution in advance of other classes of creditors. Adding some credence to this interpretation is new Bankruptcy Rule 3001(g), which requires the Bankruptcy Court to accept a warehouse receipt, scale ticket or similar document as *prima facie* evidence of the validity and amount of a claim of ownership of a quantity of grain where not inconsistent with state law.[6]

· ■ To be read in *pari materia* is the 1984 Amendment of section 507(a)(5). To the extent a producer does not recover the full amount of his grain by way of section 557 expedited procedures, the producer holds an allowed unsecured claim with respect to which section 507(a)(5) provides a $2,000 maximum fifth priority. In that fashion section 507(a)(5) comes into play after the distribution under section 557. Any unsecured shortage remaining after the $2,000 priority payment is relegated to a general unsecured status to share equally with other like claims in the residue of the estate.

■ There must be woven into the scheme of distribution the more explicit rights given certain producers who sold grain to the debtor elevator on the eve of insolvency. Under 1984 section 546(d) such seller is allowed his statutory (or common law) right of reclamation if the seller made written demand therefor within 10 days after the debtor warehouseman's receipt of the grain. The parallel with Kan.Stat.Ann. § 84–2–702 is obvious. However, no seller reclamation rights are asserted here. All grain producer claims rest on a storage bailment. Allowed claims in that category shall share pro rata in all grain proceeds remaining after payment of the Trustee's costs and expenses as provided by section 557(h). Such subordination of Bank's lien renders its secured claim valueless and relegated to an unsecured non-priority status. Allowed grain depositor claims are, respectively, accorded section 507(a)(5) priority with respect to the amount remaining after the pro rata distribution of the grain proceeds.

The Trustee's objection to grain depositor status claimed by Leland Frost, Curtis Terrill, Joe Miller and David Shurigan shall proceed to hearing. In that connection Bankruptcy Rule 3001(g), *supra,* should be noted. It is there provided that, unless State law is otherwise, a warehouse receipt, scale ticket or "similar type of document routinely issued as evidence of title by a grain storage facility" constitutes *prima facie* evidence of the validity and amount of a claim of *ownership* of a quantity of grain.[7] Upon determination of those four objections, an order shall be entered directing distribution in accordance with this Memorandum.

Dated and entered at Wichita, in said district, this 27th day of November, 1985.

---

5. See Rules of Construction, 11 U.S.C. § 102(3).

6. Kansas law is not inconsistent with Rule 3001(g), which places title in the holder of the warehouse receipt. *See* KAN.STAT.ANN. § 84–7–502, *et al.* During a hearing before the Senate Judiciary Committee, this situation was likened to that where a public garage, after filing for bankruptcy, refused to return the owner's car, because it had become "property of the estate" and the Trustee was the one who would decide whether to return the car or sell it and let the owner sue to collect whatever was left. *See* Elevator Insolvency Hearings, Hearing on S.

839 before the Subcomm. on Courts of the Senate Comm. on the Judiciary, 97th Cong., 1st Sess. 32, 33 (Statement of Rep. Emerson).

7. Also to be kept in mind are Kansas holdings that if, by agreement, a grain producer can surrender his scale ticket for the market price of the grain the transaction is a *sale* as of the time the grain was deposited. *Bonnett v. Farmers,* 105 Kan. 121, 181 P. 634 (1919). But absent such agreement the deposit is a bailment. *Zuber v. Minshall,* 123 Kan. 595, 256 P. 806 (1927).