In re Kenneth R. MICKELSON and Mary Jean Mickelson d/b/a Mickelson Seed Company, Debtors.

Civil No. A2–96–52.

United States District Court,
D. North Dakota,
Southeastern Division.

July 30, 1996.

George M. Ackre, Jr., Ackre & Baer, Ctd., Cando, ND, for Kenneth R. Mickelson and Mary Jean Mickelson, Debtors.

Kip M. Kaler, Kaler Law Office, Fargo, ND, for Wayne Drewes, as Bankruptcy Trustee for Debtors.

Shane C. Goettle, McGee Law Firm, Minot, ND, for W.E.J.C.O., Inc., Interested Party and Wayne Johnson, President of WEJCO.

Joseph A. Turman, DeMars & Turman, Fargo, ND, for Pete Haman, Interested Party and Curtis Haman, Creditor.

Lynn C. Jordheim, U.S. Attorney's Office, Fargo, ND, and Lawrence A. Casper, U.S. Department of Justice, Washington, DC, for Internal Revenue Service, Creditor.

## MEMORANDUM AND ORDER

WEBB, Chief Judge.

Two motions are before the court. First, Appellee, the United States, moved to dismiss this appeal for lack of jurisdiction. Second, Appellants appeal from the February 20, 1996, Order of the United States Bankruptcy Court denying priority status to all claimants. Appellee's motion to dismiss appeal is denied, and the Order of the Bankruptcy Court is affirmed.

### Background

Debtor, Kenneth R. Mickelson, owned and operated Mickelson Seed Company ("MSC"). MSC's business consisted of the following:

[i]t bought grain from farmers, conditioned it and resold it in the market as seed for planting. It also custom conditioned seed for farmers—taking the farmer's seed in, treating it with fungicide and returning it to the farmer.

Memorandum and order at 1. MSC's seed plant consisted of a building with treating equipment, a scale, and a warehouse for the storage of bagged seed and equipment. Ten grain bins are on site with total storage capacity of 30,000 bushels. The Debtor's business was not licensed by the state of North Dakota as a public warehouse and according to the debtor's testimony, he did not accept grain for storage purposes. He did, however, purchase grain from farmers and re-sell it to the public, to other farmers, and other seed companies.

On May 15, 1995, MSC filed a bankruptcy petition with the United States Bankruptcy Court, District of North Dakota. Appellants, Wayne Johnson, Curtis Haman, and Pete Haman filed priority claims pursuant to 11 U.S.C. § 507(a)(5)(A). Trustee, Wayne

Drewes, subsequently filed an objection to these claims. On February 8, 1996, the Bankruptcy Court held a hearing to determine whether the claimants were entitled to priority status. The Bankruptcy Court concluded:

1) that only bailments of grain receive priority treatment under § 507(a)(5)(A);

2) that MSC did not "regularly" store grain for producers such that it qualifies as a "grain storage facility"; and

3) that, with respect to Curt Haman's claim, farmers who prepay for seed cannot receive priority treatment under § 507(a)(5)(A).

The first issue the court will address is whether it has jurisdiction over this appeal. Appellee, the United States, argues that this court does not have jurisdiction over this appeal because 1) the Bankruptcy Court's order denying priority status is not a "final" judgment, and 2) appellants have not sought leave of court to hear an interlocutory appeal. Appellants resist the motion.

### Analysis

### I. Jurisdiction

This court's jurisdiction to hear appeals from bankruptcy courts is defined by 28 U.S.C. § 158(a), which states in relevant part: "The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees, and with leave of the court, from interlocutory orders and decrees, of bankruptcy judges . . ."

■ The Eighth Circuit has held to be "final" bankruptcy decisions which resolve singular disputes in isolated, separate adversary proceedings affecting only one aspect of the bankruptcy estate. *See e.g. Lewis v. U.S. Farmers Home Admin.*, 992 F.2d 767, 773 (8th Cir.1993). This test for finality or appealability arguably departs from the general test that an order is appealable only if it ends the litigation on the merits and leaves nothing for the court to do but execute the judgment. However, it is now settled that in bankruptcy proceedings the courts take a more liberal view of what constitutes a sepa-

rate dispute for purposes of appeal. *In re Saco Local Dev. Corp.*, 711 F.2d 441, 443–45 (1st Cir.1983).[1]

In light of the more liberal rule regarding finality of bankruptcy decisions, the court in *Saco* reasoned that:

> In sum, given a longstanding Congressional policy of appealability, an uninterrupted tradition of judicial interpretation in which courts have viewed a 'proceeding' within a bankruptcy case as the relevant 'judicial unit' for purposes of finality, and a legislative history that is consistent with this tradition, we conclude that a 'final judgment, order, or decree' under [28 U.S.C. § 158(a) ] includes an order that conclusively determines a separable dispute over a creditor's claim or *priority* (emphasis added).

*Id.* at 445.

■ This court's analysis is also guided by the three part test established by the Eighth Circuit to determine whether a bankruptcy decision is final. The three factors are the extent to which: 1) the order leaves the bankruptcy court nothing to do but execute the order; 2) delay in obtaining review would prevent the aggrieved party from obtaining effective relief; and 3) a later reversal on that issue would require recommencement of the entire proceeding. *In re Apex Oil Co.*, 884 F.2d 343, 347 (8th Cir.1989).

■ Recognizing the more liberal view of what constitutes a separate dispute for appealability and applying the three part test of the Eighth Circuit, this court concludes that the Bankruptcy Court's order is final for purposes of appeal. First, the transcript of testimony from the priority status hearing indicates that these claims were fully adjudicated on their merits, as the order finally resolves the issue of appellants' claim of priority status under § 507(a)(5)(A). *In re Olson*, 730 F.2d 1109, 1110 (8th Cir.1984). Second, if this court has no jurisdiction to hear the present appeal, appellants will not be able to seek review of the order until the conclusion of the entire proceeding. *Id.*

Since the bankruptcy order is final, this court has jurisdiction to hear Appellants' appeal under 28 U.S.C. § 158(a).

## II. The Merits

The principal issue is whether any of the Appellants are entitled to priority status under § 507(a)(5)(A). Under that section, three criteria must be established for priority treatment:

1) The claim must be by a person engaged in the production or raising of "grain" as defined by § 557(b)(1).

2) The claim must be for grain or grain proceeds.

3) The claim must be against a debtor who owns or operates a "grain storage facility" as a site or physical structure regularly used to store grain for producers or to store grain acquired from producers for resale.

This appeal involves the review of one factual finding under the "clearly erroneous standard" and two issues of law, which are reviewed *de novo*. *Wegner v. Grunewaldt*, 821 F.2d 1317, 1320 (8th Cir.1987).

## A. SCOPE OF § 507(a)(5)(A)

■ Sections 507(a)(5)(A) and 557 were both enacted in response to the farming crisis of the 1980's. S.Rep. No. 65, 98th Cong., 1st Sess. 22 (1983). Although there is practically no legislative history specifically attributed to the 1984 amendments (§§ 546(d), 557, and 507(a)(5)(A)), they are essential counterparts of §§ 236, 235, and 237, respectively, of the Omnibus Bankruptcy Improvements Act of 1983. The latter was the product of extensive Senate hearings, which guide this court in interpreting the 1984 amendments. *In re Esbon Grain Co.*, 55 B.R. 308, 313 (Bankr.D.Kan.1985).

■ The court is in agreement with the Bankruptcy Court that the legislative history surrounding the 1983 and 1984 farm elevator bankruptcy amendments reveals Congressional intent to limit the application of those amendments to bailor/bailee relationships. The following Senate subcommittee testimony supports this conclusion:

> priority status to a creditor's claims against the estate.

---

1. Similar to this appeal, *In re Saco* involved a trustee's appeal from a bankruptcy order giving

(3) the requirements of present law which mandate that owners of crop assets held by the debtor solely on the basis of his status as a *bailee* must share grain assets held by the trustee in bankruptcy on a pro rata basis with any creditor holding a security interest in assets of a similar type which are owned by the debtor, such that the bailors of such storage contract crop assets have the value of their property diminished for the benefit of such creditors when there is a shortage of produce on hand;

(4) the unprotected status, as unsecured creditors in bankruptcy, of farmers who have sold crops to a farm produce storage facility but have not received payment for that crop;

(5) the reluctance of some courts to accept warehouse receipts and scale tickets, the principle [sic] documents used in warehouse business to establish record of ownership of crop assets stored in warehouse facilities on *bailment* contracts, as evidence of ownership in bankruptcy abandonment proceedings; ...

S.Rep. No. 98–65, 98th Cong., 1st Sess., p. 25, The Omnibus Bankruptcy Improvements Act of 1983.

■■■ "Paragraphs (3) and (5) have an obvious correlation with 1984 §§ 557 and 507(a)(5)(A)," *In re Esbon*, 55 B.R. at 313, and, in the court's view, demonstrate the Senate's concern for farmers as *bailors*. Appellants cite paragraph (4) to advance the argument that the Senate also had the same concern for farmers as *sellers*. They argue that the Senate report accompanying the Omnibus Bankruptcy Improvements Act of 1983 allows a right of reclamation to producers who have sold goods to a debtor in bankruptcy but have not received payment. Appellants' emphasis on paragraph (4), however, is misplaced. The proper interpretation of paragraph (4) is that it correlates with § 546(d). *Id.* That section codifies seller reclamation rights, which are not being asserted here. Although § 546(d) does provide sellers with a limited right to relief in certain cir-

cumstances, the court is of the view that nothing in § 546(d) extends the narrow class entitled to priority status under § 507(a)(5)(A) to sellers.[2] *Cf. Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.,* 789 F.2d 98, 100 (2d. Cir.1986) (holding that priorities under § 507(a) must be narrowly construed).

Congressional statements regarding the 1984 amendments further support and demonstrate that Congress was concerned only with bailor/bailee relationships in the context of §§ 557(b) and 507(a)(5)(A). As Representative Glickman explained on the House floor:

Why should we give special considerations to farmers over other creditors in grain elevator bankruptcies? In response, I would point out a number of factors which put farmers in a unique situation vis-a-vis their elevators in these cases:

\* \* \* \* \* \*

No. 4, the priority provided under the bill extends *only to farmers as bailors.* That basically means that they had grain stored at the elevator and nothing more.

130 Cong. Rec. H1817 (statement of Rep. Glickman) (emphasis added).

Representative Emerson's statements regarding §§ 557(b) and 507(a)(5)(A) similarly demonstrated concerns for farmers as bailors:

The transaction between a farmer and the warehouseman is ordinarily a *bailment.* The farmer delivers his grain to the warehouse under a contract of *bailment* [.] Under this contract, the warehouseman, bailee, agrees to redeliver the bailed property to the farmer, bailor, on demand and in the same condition in which it was originally received....

At this point, an important distinction must be observed. The simple bailment situation is to be contrasted with the delayed-pricing contract. *In the bailment, as I have said, title to the grain does not pass to the warehouseman.* This is to be contrasted with the situation in the delay-

---

**2.** 11 U.S.C. § 546(d) was also amended in 1984 "to provide greater reclamation protection for producers who have sold grain to an insolvent elevator but have not received payment." S Rep. No. 65, 98th Cong., 1st Sess. 65 (1983).

pricing contract, where there is an actual sale in which title passes from the farmer to the warehouseman. So, the distinction is that under the bailment, title of the grain remains with the farmer....

S.Rep. No. 65, 98th Cong., 1st Sess., 25, The Omnibus Bankruptcy Improvements Act of 1983, Report of the Committee on the Judiciary, United States Senate (emphasis added).

■ The Bankruptcy Court correctly concluded that § 557 addresses those situations where producers have deposited grain in a grain storage facility for storage and/or resale, but where title always remains with the producer. Appellant Wayne Johnson, testifying through affidavit, stated that he marketed grain through the Debtor in the same fashion he would have with any other elevator or storage facility. Johnson claimed he delivered grain to the Debtor only because of a better price. The Bankruptcy Court correctly found, however, that there was no evidence suggesting that the transaction was anything but a "straight forward purchase of grain by the Debtor." Memorandum and Order at 5. Since Johnson cannot claim to have retained title to the grain, he was properly denied § 507(a)(5)(A) priority status.

■ In Pete Haman's case, the Debtor purchased grain from Haman and a short time later sold it to an elevator, which the Debtor testified only happened when he had overbought grain needed for seed purposes. Again, the Bankruptcy Court correctly found no evidence suggesting the Debtor accepted grain for storage or that he accepted grain in bailment for resale. Memorandum and Order at 5. Haman cannot claim to have retained title to the grain he sold to Debtor. Accordingly, Pete Haman also fails to qualify as a § 507 priority claimant.[3]

## B. WHETHER MICKELSON SEED COMPANY WAS A "GRAIN STORAGE FACILITY"

Section 557(b) defines the type of debtor against whom a § 507(a)(5)(A) claim can be made. The debtor is required to own or operate a "grain storage facility," which is defined as "a site or physical structure regularly used to store grain for producers, or to store grain acquired from producers for resale." § 557(b)(2).

■ Regarding the first part of § 557(b)(2), the court concludes that the debtor did not "regularly store grain for producers." That phrase implies that the debtor would receive grain from producers and hold it in storage with the title of the grain remaining in the producer. Here, the debtor was in the business of buying grain, and processing and treating it in such a manner, as to make it fit for seed purposes. The debtor testified that he did not ever take grain from farmers and simply store it with the intent of returning it to them in the same condition.

■ The second part of § 557(b)(2)'s definition includes a facility used "to store grain acquired from producers for resale." The debtor is clearly not a grain elevator such that they would buy grain from producers and resell that same grain to other grain customers. The court is of the view that the debtor does not *regularly* "store grain for producers" nor does he "store grain acquired from producers for resale" in the same condition as purchased. *See In Re James B. Downing & Co.,* 74 B.R. 906, 910 (Bankr. N.D.Ill.1987) (reasoning that the fact that the debtor uses a dairy by-product in its manufacturing process or that its products are used for fertilizer or animal feed does not

3. Appellants also argue that the term "resale" in the second clause of § 557(b)(2) extends the priority in § 507(a)(5)(A) to buyer/seller relationships. Appellants contend that in a bailment relationship with the farmer retaining title, the bailee may only *sell* the grain on the farmer's behalf. The bailee does not *re*sell it. The court is of the view, however, that Appellants take the word "resale" out of context. Viewing the word in isolation, such a reading is plausible. However, it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it was used." *Reno v. Koray,* — U.S. —, —, 115 S.Ct. 2021, 2025, 132 L.Ed.2d 46 (1995) (quoting *Deal v. United States,* 508 U.S. 129, 132, 113 S.Ct. 1993, 1996, 124 L.Ed.2d 44 (1993)). As detailed above, the context of the language in § 557(b)(2) demonstrates that it was not intended to be extended beyond bailor/bailee relationships.

make it into a grain storage facility). These factors provide a sufficient basis for the Bankruptcy Court's finding of fact, and do not leave this court with a "definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

## C. WHETHER PREPAYMENT REPRESENTS A TITLE RIGHT FOR "GAIN OR GRAIN PROCEEDS"

██ For a claimant to have a right to a § 507(a)(5)(A) priority, they must first have been entitled to recover the grain itself or, where it has been sold by the trustee pursuant to § 557(i), the proceeds of the grain. Curt Haman has no such entitlement. On April 20, 1995, Curt Haman prepaid for 1000 bushels of barley seed with a check for $3,000. The treated barley seed was to be delivered at a future date. Haman did not deposit any grain with the debtor for purposes of storage, nor did he deposit any grain for purposes of seed treatment. Thus, Haman is not making a claim for his grain; rather, he is making a claim for the return of his $3,000 payment, which does not represent a title right for "grain or grain proceeds" under § 507(a)(5)(A).

For the reasons discussed herein,

1) Appellee's motion to dismiss the appeal (civ.doc. # 4) is **DENIED**;

2) Appellants' request for costs and attorney's fees in connection with this motion (civ.doc. # 9) is **DENIED**;

3) The Bankruptcy Court's order denying priority status to Appellants is **AFFIRMED**.