In re BEARHOUSE, INC., Debtor.

FARMERS RICE MILLING COMPANY, INC., Plaintiff,

v.

Claude S. HAWKINS, Jr., Interim Trustee for Bearhouse, Inc., Defendant.

Edward L. OLTMANN and Gary W. Shrum d/b/a E & G Agri and Virgie M. Reinhart and Virginia R. Ray d/b/a Wolfe Prairie Farms, Plaintiffs,

v.

BEARHOUSE, INC., Claude S. Hawkins, Jr., Interim Trustee, and National Bank of Commerce of Pine Bluff, Defendants.

FARMERS RICE MILLING COMPANY, INC., Plaintiff,

v.

BEARHOUSE, INC., Aetna Casualty & Surety Company and National Bank of Commerce of Pine Bluff, Defendants.

LADD FARMS, a Partnership Composed of Earl Ladd, Glenn Ladd, Clifton Ladd and Keith Ladd, Plaintiffs,

v.

Claude HAWKINS, Jr., Trustee, Bearhouse, Inc., and National Bank of Commerce of Pine Bluff, Defendants.

LADD FARMS, a Partnership Composed of Earl Ladd, Glenn Ladd, Clifton Ladd and Keith Ladd, Plaintiffs,

v.

Claude HAWKINS, Jr., Interim Trustee, Bearhouse, Inc., National Bank of Commerce of Pine Bluff, Defendants.

FARMERS RICE MILLING
COMPANY, INC., Plaintiff,

v.

Claude S. HAWKINS, Jr., Interim
Trustee for Bearhouse, Inc.,
Defendant,

National Bank of Commerce of Pine
Bluff, Intervenor,

Commodity Credit
Corporation, Intervenor.

Bankruptcy No. ED 87–42M.
Adv. Nos. 87–134M, 87–139M,
87–186M and 87–209M.
CMS Nos. 87–394M, 87–434M.

United States Bankruptcy Court,
W.D. Arkansas,
El Dorado Division.

Jan. 22, 1988.

Charles R. Camp, Little Rock, Ark., for debtor.

Claude S. Hawkins, Jr., Ashdown, Ark., Trustee.

William Meeks, Hamburg, Ark., for Ladd Farms.

Terry F. Wynne, Pine Bluff, Ark., for Nat. Bank of Commerce of Pine Bluff.

Claude Skelton, Little Rock, Ark., for U.S. Dept. of Agriculture.

Thomas S. Streetman, Crossett, Ark., for Farmers Rice Mill. Co., Inc.

Bob Lawson, Little Rock, Ark., for U.F. Coleman and Monticello Gin & Elevator Co.

Larry McCord, Asst. U.S. Atty., Fort Smith, Ark., for Commodity Credit Corp.

William K. Ball, Monticello, Ark., for Edward L. Oltmann, Gary Shrum, Virgie & Virginia Ray.

Overton S. Anderson, Little Rock, Ark., for Aetna Cas. & Sur. Co.

## MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

On March 10, 1987, an involuntary petition was filed against Bearhouse, Inc. (Bearhouse). Bearhouse did not contest the petition, so an order was entered adjudicating Bearhouse a debtor under chapter 7. Hon. Claude S. Hawkins, Jr., was appointed interim trustee. On March 12, 1987, Bearhouse filed a motion to convert to chapter 11, and on April 13, 1987, an order was entered granting the motion. Hon. Claude S. Hawkins, Jr., was appointed trustee pursuant to 11 U.S.C. § 1104.

Bearhouse is an operator of five grain warehouse and storage facilities. These facilities are located at Arkansas City, Hamburg, Kelso, McGhee and Portland, Arkansas. The stock in Bearhouse is owned by Richard E. Griffin (Griffin), Robert E. Cockrum (Cockrum), James B. Young, and Lonnie Couch (Couch). Couch is the president of Bearhouse, Cockrum is the chairman of the board, and Griffin is the secretary. Bearhouse's grain storage facilities are licensed under the Federal Warehouse Act. *See* 7 U.S.C. § 241, et seq.

On April 1, 1987, an order was entered pursuant to 11 U.S.C. § 557 authorizing the trustee to sell all of the grain stored at Bearhouse's facilities subject to all existing claims of ownership as this Court will de-

termine in this memorandum opinion. The trustee's report of sale indicates the following grain was sold:

| Rice: | | |
|---|---|---|
| Hamburg | 1,835,600.00 | pounds |
| McGhee | 2,868,150.00 | pounds |
| Arkansas City | 1,831,240.00 | pounds |
| Kelso | 3,661,800.00 | pounds |
| Total | 10,196,790.00 | pounds |
| Oats: | | |
| Hamburg | 22,568.16 | bushels |
| Kelso | 3,838.13 | bushels |
| McGhee and Hamburg (bagged) | 27,757.20 | bushels |
| Total | 54,163.49 | bushels |
| Soybeans: | | |
| Hamburg | 29,834.74 | bushels |
| McGhee | 8,612.28 | bushels |
| Hamburg (bagged) | 40.00 | bushels |
| McGhee (bagged) | 854.00 | bushels |
| Total | 39,341.02 | bushels |

Several hearings were held to determine the validity and amount of the claims of ownership of the sale proceeds from the grain sold. The record consists of the evidence received at hearings on April 1, 1987, June 26, 1987, July 8, 1987, and December 7, 1987.

The proceedings before the Court are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(B) and (K). The Court has jurisdiction to enter a final judgment in these proceedings. The following shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule of Procedure 7052.

# I

## U.F. COLEMAN, JR.'S CLAIM TO PROCEEDS FROM SALE OF RICE STORED AT McGHEE

U.F. Coleman, Jr., (Coleman) is a farmer who lives in Greenville, Mississippi, and farms near Lake Village, Arkansas. Coleman delivered 19,395.70 bushels of rice to Bearhouse's facilities at McGhee, Arkansas, between the 4th and the 11th of February 1987 and received scale tickets as evidence of delivery. All of Coleman's rice was placed in Bins 2 and 3 at McGhee, Arkansas. According to Coleman the rice was of a quality which made it suitable for milling as seed rice.

Coleman argues that he remains the owner of 19,395.70 bushels of rice because neither an agreement to sell his rice nor an actual sale occurred. Contrary to his argument, Coleman testified as follows:

(Questions by the Court):

Q: OK. So my question to you is, they received this rice to purchase from you on seed rice price basis, right?

A: It was a premium attached to it and for the specific purpose of seed.

Q: OK. They weren't receiving it simply to store for you now.

A: No. It was to be sold at however way they saw fit, I guess.

Record at 257, June 26, 1987.

(Cross–Examination by Thomas S. Streetman):

Q: OK. Did you enter into a contract with them on this seed rice?

A: I entered into a verbal agreement.

Q: No written contract.

A: No written contract.

Q: And there was a definite agreement or understanding about price?

A: When you go to talking about price, we were talking about thirty-one cents (31¢) the market, over the payback.

Record at 260, June 26, 1987.

Under Arkansas law, "[u]nless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods ... even though a document of title is to be delivered at a different time or place." A.C.A. § 4–2–401(2) (1987). A sale consummates in the passing of title from the seller to the buyer. A.C.A. § 4–2–106(1) (1987).

The rice was delivered to Bearhouse pursuant to an oral contract of sale. The evidence establishes that title passed from Coleman to Bearhouse upon delivery of the grain to Bearhouse's facilities at McGhee. No bailment relationship existed on the day the bankruptcy petition was filed.

Coleman argues alternatively that title did not pass to Bearhouse upon delivery of the rice because A.C.A. § 2–17–303 (1987) provides that title does not pass to a warehouseman "unless such sales ... are supported by a written document executed by the owner specifically conveying title to the

grain to the public grain warehouseman." Coleman's argument is without merit for two reasons.

First, Section 2–17–303 was part of Act 401 of the Acts of Arkansas. Section 5 of Act 401 provides:

The provision of this Act shall apply to all public grain warehousemen and the operation of such public grain warehouses, unless such public grain warehouse is licensed under the provisions of the United States Warehouse Act, (39 STAT 486; 7 U.S.C. § 241–273) as amended.

Since Bearhouse is a federally licensed warehouse it is exempt from application of Section 2–17–303. Second, this Act has been construed to apply only in situations when grain is delivered for storage. *See Farm Bureau Mut. Ins. Co. of Ark. v. Wright*, 285 Ark. 228, 686 S.W.2d 778 (1985). Coleman's testimony clearly reflects that storage was not contemplated. Since Coleman's rice was sold to Bearhouse, he did not own any of the rice sold by the trustee. Although Coleman has a claim as an unsecured creditor, he is not entitled to share in the proceeds of the sale of the rice sold by the trustee. *See In re Fairfield Elevator Co., Inc.*, 14 U.C.C. 96 (S.D. Iowa 1973).

## II

### SCOTT YOUNG'S CLAIM TO PROCEEDS FROM SALE OF RICE STORED AT HAMBURG

Scott Young is a farmer who lives in Portland, Arkansas. His father, James Young, owns twenty-five percent of the stock of Bearhouse. During the 1986 crop year, Scott Young leased farmland from Cockrum.[1] Located on this farm are five 8,000 bushel capacity grain storage bins described as the C series bins. These bins are located approximately 100 yards east of Bearhouse's Hamburg facilities. Although the evidence is not clear, apparently Scott Young's lease did not include a lease of the C series bins.

On September 1, 1985, Cockrum and his wife, as owner and lessor, leased the C series bins to James Young for a term of one year beginning September 1, 1985, and ending August 31, 1986. On September 1, 1985, James Young subleased the C series bins to Bearhouse for the same period of time.

James Young also owned grain bins known as the H series bins which were located on his farm. He leased his H series bins to Bearhouse for the same period of time. Pursuant to these two leases, James Young was to receive one and one-half cents per bushel of grain stored in the bins. The C series and H series bins were included under Bearhouse's federal license.

Scott Young produced a crop of rice in 1986, and on the day the petition was filed against Bearhouse he had rice stored as follows:

C series bins:   C–3 = 8,000.00 bushels
H series bins:   H–2 = 6,000.00 bushels
                    H–4 = 4,000.00 bushels
                    H–5 = 4,000.00 bushels

The Court ordered that all rice in the debtor's possession, including this rice, be sold by the trustee even though Scott Young filed a timely objection. The trustee and other claimants to the rice sold by the trustee argue that because Scott Young stored his rice in facilities which were under Bearhouse's federal license, the rice should be considered as part of Bearhouse's commingled mass of fungible grain. Since there is a shortage of rice, they also argue that Scott Young is entitled to receive only a pro rata share of the sale proceeds. Scott Young argues that the C series and H series bins were not leased to Bearhouse on the day the petition was filed and that none of the rice in these bins was property of Bearhouse or any other owner because there was no storage contract with Bearhouse.

Scott Young testified that he had an agreement with his father whereby he "swapped" the use of the C series bins for the use of the H series bins. Scott Young

---

1. The leased land was known as Star Rice Sales or Star Rice Mill farm. Cockrum owns twenty- five percent of the Bearhouse stock.

stated that he knew the H series bins had been leased to Bearhouse at one time but did not know of any lease to Bearhouse when he placed his rice in the bins in the fall of 1986.

James Young testified that on the day the petition was filed against Bearhouse none of these grain bins were leased to Bearhouse. He testified that no lease payments were made by Bearhouse after April or May 1986. Bearhouse's bookkeeper testified that Bearhouse had not paid any rent or stored any grain in these bins since April or May 1986. The written leases with Bearhouse terminated August 31, 1986. Bearhouse's records do not reflect that the grain in question was owned by Bearhouse or stored for customers of Bearhouse.

■ Based on the evidence presented, the rice in the C series and H series bins is not property of the estate or property of any other owner but is the property of Scott Young. The fact that these grain bins were included in Bearhouse's federal license does not establish title to the rice in Bearhouse under the facts of the case.

Scott Young also argues that he should not be required to pay any of the expenses of the sale of his rice. The Court ordered the trustee to sell the rice because of the existence of a bona fide issue of ownership and because of the perishable nature of this commodity. The circumstances of Scott Young's claim are unique. Because of James Young's relationship with Bearhouse and because Scott Young's rice was found in facilities designated as Bearhouse's facilities under the federal warehouse license, suspicious circumstances were created.

11 U.S.C. § 557(h)(1) specifically authorizes the Court to allow the trustee to recover costs, including his commission. *See also* 11 U.S.C. § 503(b)(1)(A). Despite the fact the rice was not property of the estate, it would be inequitable to burden the other owners with the cost of liquidating Scott Young's rice because Scott Young and his father created the circumstances which caused the rice in the c series and H series bins to appear to be property of the estate. Therefore, Scott Young's claim to the proceeds from the sale of rice located in the C series and H series bins will be subject to a pro rata share of the cost of sale including the trustee's commission.

## III

EDWARD L. OLTMANN AND GARY W. SHRUM, AS PARTNERS d/b/a E & G AGRI, AND VIRGIE M. REINHART AND VIRGINIA R. RAY AS PARTNERS d/b/a WOLFE PRAIRIE FARMS' CLAIM TO PROCEEDS FROM SALE OF RICE STORED AT McGHEE

On February 3, 1987, Edward L. Oltmann and Gary W. Shrum, on behalf of themselves and the other claimants, E & G Agri, Virgie M. Reinhart, Virginia R. Ray and Wolfe Prairie Farms, (collectively referred to as Shrum) executed a written contract to sell 11,655.12 bushels of No. 1 grade long grain rough rice to Bearhouse. The contract price was twenty-eight cents per bushel over the world market price. Delivery of the rice to Bearhouse's storage facilities at McGhee, Arkansas, was completed on February 12, 1987. All of the rice was placed in Bin 4. Shrum was issued ten scale tickets as evidence of the delivery of the rice. According to the testimony, no other rice was commingled with Shrum's rice.

Customarily, Bearhouse would have remitted payment for the rice to Shrum within a few days of delivery. On February 17, 1987, Shrum learned that Bearhouse was in financial trouble. Shrum visited Bearhouse's facilities at McGhee on February 18, 1987, and observed rice being loaded from Bin 4 into two rail cars. Shrum orally demanded a return of the rice on February 18, 19, and 20, 1987, but the demands were refused.

On February 27, 1987, a temporary restraining order prohibiting Bearhouse from removing the rice was issued by the Chancery Court of Ashley County, Arkansas. On March 10, 1987, the involuntary bankruptcy petition was filed against Bear-

house. When the bankruptcy was filed, one-half of Shrum's rice remained in Bin 4 and the other one-half was located in the two rail cars. On March 11, 1987, the Chancery Court of Ashley County issued a decree of reclamation ordering Bearhouse to return to Shrum the 11,655.12 bushels of rice located in Bin 4 and in the two rail cars.

■ Shrum argues that he is entitled to all of the proceeds of the trustee's sale of the rice in Bin 4 and in the two rail cars because he obtained the order of reclamation. This argument is without merit. Pursuant to 11 U.S.C. § 362 the automatic stay became effective on the date the bankruptcy case was filed, March 10, 1987. Any judgment against the debtor or against property of the estate entered after the stay became effective, without first obtaining relief from the stay, is void even if the creditor lacked notice of the filing of the bankruptcy petition. 2 *Collier on Bankruptcy* ¶¶ 362.03 and 352.11 (15th ed. 1987); *Borg–Warner Acceptance Corp. v. Hall*, 685 F.2d 1306 (11th Cir.1982).

Shrum argues alternatively that because he made oral demand within ten days of delivery of his rice to Bearhouse, he possessed the rights of an unpaid reclaiming seller on the day the petition was filed pursuant to A.C.A. § 4–2–702 (1987). The trustee and some of the claimants argue that the rice was part of an unidentifiable commingled mass of fungible goods and not capable of specific identification required for reclamation. They further argue that Shrum does not have a right to reclaim because he failed to give written demand to Bearhouse as required by 11 U.S.C. § 506(c).

Before the adoption of the Uniform Commercial Code in Arkansas, sellers had a right to reclaim goods sold on credit under certain conditions. The reclaiming seller was required to establish that the buyer fraudulently induced the seller to sell goods on credit, while not intending to pay

for them. *Taylor v. Mississippi Mills*, 47 Ark. 247, 1 S.W. 283 (1886). The buyer acquired only a defeasible title subject to the seller's right to reclaim provided that the goods had "not passed into the hands of bona fide purchasers" and provided that the goods could be identified. *Taylor v. Mississippi Mills*, 1 S.W. at 285. *See also Neal v. Cone*, 76 Ark. 273, 88 S.W. 952 (1905); *Lavender v. Finch*, 144 Ark. 199, 222 S.W. 35 (1920). The defrauded seller's right to reclaim was superior to the rights of an attaching creditor of the buyer because the attaching creditor was not considered a bona fide purchaser for value under these circumstances. *Taylor v. Mississippi Mills*, 1 S.W. at 285. The original version of U.C.C. § 2–702 adopted in Arkansas contained language which suggested that a seller's right to reclaim would be subject to a prior perfected interest of a lien creditor of the buyer as well as the rights of a bona fide purchaser from the buyer of the goods sought to be reclaimed.[2] There are no reported cases in Arkansas construing the original version of this section of the Uniform Commercial Code.

An amendment to U.C.C. § 2–702(3) deleted the provision that a seller's right to reclaim was subject to the rights of a "lien creditor" of the debtor. *See* Mann & Phillips, *Section 546(c) of the Bankruptcy Reform Act: An Imperfect Resolution of The Conflict Between the Reclaiming Seller and the Bankruptcy Trustee*, 54 Am.Bankr.L.J. 239, 251 (Summer, 1980). This amendment was adopted in Arkansas in 1967, and A.C.A. § 4–2–702(3) (1987) now provides, in part, as follows:

> (3) The seller's right to reclaim under subsection (2) is subject to the rights of a buyer in ordinary course or other good faith purchaser under this chapter (§ 4–2–403).

The first prerequisite to a right to reclaim is the requirement that goods which are to be reclaimed must be in the possession of the buyer and be identifiable. *In re Landy Beef Co.*, 30 B.R. 19 (Bankr.D.Mass.

---

**2.** Ark.Stat.Ann. § 85–2–702 (Repl.1961):

(3) The seller's right to reclaim under subsection (2) is subject to the rights of a buyer in ordinary course or other good faith purchaser

or *lien creditor* under this Article. Successful reclamation of goods excludes all other remedies with respect to them.
(Emphasis added).

1983); *In re Daylin, Inc.*, 596 F.2d 853 (9th Cir.1979).

The facts in this case present several questions. Are fungible goods subject to a right of reclamation? If a right of reclamation exists, what quantity of rice is subject to reclamation?

Shrum's rice constitutes fungible goods as defined by A.C.A. § 4–1–201(17).[3] In cases where fungible goods were commingled and no shortage of goods to meet the demands existed the right to reclaim has been upheld. *See In re Charter*, 54 B.R. 91 (Bankr.M.D.Fla.1985); *In re Walton Elevators, Inc.*, 32 B.R. 912 (Bankr.W.D.Ky.1983); *In re Western Farmers Association*, 6 B.R. 432 (Bankr.W.D.Wash. 1980). Goods which are fungible are not always commingled with other fungible goods. The evidence here is undisputed and convincing that although the rice in question was fungible by its nature, it was never commingled with other rice and is specifically identifiable. There is no reason to deny reclamation merely because a shortage of goods exists. Therefore, if Shrum has a right to reclaim it extends to the proceeds from the sale of all of the rice in Bin 4 and the two rail cars at McGhee, Arkansas.

Although Section 4–2–702 governs the rights of reclaiming sellers, when bankruptcy intervenes 11 U.S.C. § 546(c) also becomes applicable. Section 546(c) purported to resolve all of the difficulties between the trustee and reclaiming sellers under the old Bankruptcy Act. Section 546 provides that the trustee's rights and powers under 11 U.S.C. §§ 544(a), 545, 547 and 549 are subject to the rights of a reclaiming seller if the seller follows the procedure prescribed in Section 546 which is not identical to the state law reclamation procedure. Section 4–2–702(2) requires only that "demand" to reclaim be made within ten days after delivery of the goods but 11 U.S.C. § 546(c) requires that *written* demand be made within ten days after delivery of goods.

A substantial number of courts construe Section 546(c) as if it were the legal basis of a seller's right to reclaim goods which end up in a debtor's estate rather than an expression of limitation on the trustee's avoiding power against the rights of a reclaiming seller. These cases conclude that failure to make written demand results in no reclamation rights in a bankruptcy case. *In re L.T.S., Inc.*, 32 B.R. 907, 909 (Bankr. D.Idaho 1983) ("compliance with the requirement of a timely written demand is essential for a seller to claim property of the bankruptcy estate"); *In re Furniture Distributors, Inc.*, 45 B.R. 38, 42 (Bankr.D. Mass.1984) ("The bankruptcy requirement is, first, the goods must be delivered in the ordinary course *while* the debtor is *insolvent*, and then, the demand must be in writing within ten (10) days."); *In re Coast Trading Co., Inc.*, 744 F.2d 686, 689 (9th Cir.1984) ("demand must be in writing to be given effect in bankruptcy"); *In re Gibson Distributing Co., Inc.–Permian Basin*, 40 B.R. 767, 769 (Bankr.W.D.Tex.1984) ("[Section] 546(c) represents the exclusive remedy and that unless a seller meets the strict ten day prior notice condition imposed by Section 546(c) he retains no other common law or statutory right of action"); *In re GIC Government Securities*, 64 B.R. 161, 162 (Bankr.M.D.Fla.1986) (motion to dismiss granted partly because of failure of sellers "to allege that they demanded reclamation in writing within ten days after the debtor received the security"); *In re Jeanes Mechanical Contractors, Inc.*, 32 B.R. 657, 658 (Bankr.D.Ky.1983) ("A reclaiming seller ... must comply with Section 546(c) of the Bankruptcy Code which clearly requires a written demand for reclamation within ten days."); *In re Koro Corp.*, 20 B.R. 241, 243 (Bankr.App. 1st Cir.1982) ("right to reclaim goods sold in the ordinary course of business is contingent upon [the seller] making written demand within ten days of the debtor's receipt of the goods"); *In re Lawrence Pa-*

---

**3.** A.C.A. § 4–1–201(17) (1987) provides:
"Fungible" with respect to goods or securities means goods or securities of which any unit is, by nature or usage of trade, the equivalent of any other like unit. Goods which are not fungible shall be deemed fungible for the purposes of this Act to the extent that under a particular agreement or document unlike units are treated as equivalents.

*perboard Corp.*, 52 B.R. 907, 910 (Bankr.D. Mass.1985) ("a written demand by the seller within ten days of delivery of the goods to the debtor is necessary under 546(c)"); *In re Charter Co.*, 52 B.R. 263, 266 (Bankr. M.D.Fla.1985) ("the § 546 requirement for written demand for reclamation within ten days is absolute"); *In re Holiday Meat Packing, Inc.*, 30 B.R. 737 (Bankr.W.D. Penn.1983) (unwritten demand for reclamation ineffective under 11 U.S.C. § 546); *In re HRT Industries, Inc.*, 29 B.R. 861 (Bankr.S.D.N.Y.1983) (failure to give timely written notice held fatal to reclamation right).

5 *Collier on Bankruptcy* ¶ 546.01 (15th ed. 1987), discussed the issue which is before the court:

> [O]ne view [of section 546(c)] was that the section merely provided a "safe harbor" for a seller whose right of reclamation was otherwise susceptible to being avoided.... Under this view the seller would not be precluded from asserting a right of reclamation based upon an oral demand ... but because the seller did not make a written demand for the goods within the time specified, its right of reclamation would be subject to avoidance. The second view was that section 546(c) provided the exclusive reclamation remedy available under the Bankruptcy Code to a seller of goods to an insolvent debtor. If a seller failed for any reason to make a written demand for its goods within 10 days of or prior to receipt ... it retained no right to reclaim those goods. Case law has resolved these two views in favor of the latter; with few exceptions courts have held that satisfaction of the ten-day written demand requirement is a prerequisite to reclamation relief.

Many cases which construe the written demand requirement of Section 546(c) to be mandatory involve facts where the ten day demand requirement of state law and bankruptcy law has not expired when the case is filed. *See, e.g., In re Lawrence Paperboard Corp.*, 52 B.R. at 907; *In re Holiday Meat Packing, Inc.*, 30 B.R. at 737. After assuming that oral demand had been made

prepetition, one court held specifically that Section 546(c) still required written demand. *See In re L.T.S., Inc.*, 32 B.R. at 907.

■ Only one reported case has been found where the seller made oral demand for return of goods within ten days after delivery of goods and the bankruptcy was filed after the ten day period expired. *See In re A.G.S. Food Systems, Inc.*, 14 B.R. 27 (Bankr.D.S.C.1980). *In re A.G.S.* concluded that because the seller complied with the applicable state law by giving oral demand within ten days of delivery of the goods, the only ramification of the seller's failure to comply with the written demand requirement of Section 546(c) was that the seller's right to reclaim was subject to attack by the trustee under his avoiding powers.[4]

There is no dispute that Shrum's oral demand complied with state law. Since the bankruptcy was filed after the ten day time limit for demanding reclamation had expired, the additional requirement of Section 546 became effective too late for Shrum to comply with it. To retroactively apply the written requirement of Section 546(c) under the facts in this case would result in subjecting this reclaiming seller to a procedure different from the procedure applicable at the time the act to be done was required to be done. This would be inconsistent with fundamental principles of due process of law. Under the facts in this case, failure to make written demand as required by Section 546(c), results only in Shrum's right to reclaim being subject to the avoiding powers of the trustee.

Whether the seller's right to reclaim goods is superior to a trustee's avoiding power is determined by state law. *In re Coast Trading Co., Inc.*, 744 F.2d 686 (9th Cir.1984). *See also In re N.S. Garrott & Sons*, 772 F.2d 462 (8th Cir.1985); 5 *Collier on Bankruptcy* ¶ 544.02 (15th ed. 1986). Under 11 U.S.C. § 544(a)(1) and (2) the trustee has the status of a judgment lien creditor and a bona fide purchaser in regard to real property of a debtor as of the

---

**4.** *See also* Mann & Phillips, *Section 546(c) of the Bankruptcy Reform Act: An Imperfect Resolution of The Conflict Between the Reclaiming* Seller and the Bankruptcy Trustee, 54 Am.Bankr. L.J. 239 (1980).

date of the commencement of a case but as to personal property the trustee only has the status of a judgment lien creditor. *See* 5 *Collier on Bankruptcy* ¶ 544.02. The Eighth Circuit, construing Missouri law, concluded that a reclaiming seller's rights are superior to the rights of a trustee under the old Bankruptcy Act.

Under § 70(a) of the Bankruptcy Act, 11 U.S.C. § 110(a) (1970), the trustee acquires title to the bankrupt's property as of the filing of the petition. But the trustee's title is subject, generally speaking, to the contract defenses and equities to which the bankrupt's title was subject. (citation omitted). *In re PFA Farmers Market Ass'n,* 583 F.2d 992, 994 (8th Cir. 1978). This statement has continued applicability under the Bankruptcy Code. 11 U.S.C. § 541(d); 5 *Collier on Bankruptcy* ¶ 541.24 (15th ed. 1987).

Arkansas cases construe the reclaiming seller's rights to personalty under the pre-Uniform Commercial Code law so that a seller's rights are superior to the rights of an attaching judgment lien creditor. *Taylor v. Mississippi Mills,* 1 S.W. at 283; *Lavender v. Finch,* 222 S.W. at 35; *Neal v. Cone,* 88 S.W. at 952. There is no indication that a different result would be warranted based on the current statutory language. Therefore, Shrum's rights are superior under state law to those of the bankruptcy trustee, and Shrum is awarded the entire proceeds from the sale of the rice in Bin 4 and in the two rail cars at McGhee, less the cost of the sale, including the trustee's commission.

## IV

### CLAIMS OF NATIONAL BANK OF COMMERCE OF PINE BLUFF, COMMODITY CREDIT CORPORATION AND FARMERS RICE MILLING COMPANY, INC. TO PROCEEDS FROM SALE OF RICE

*Facts and Discussion as Related to National Bank of Commerce of Pine Bluff*

From 1982 through the day of the filing of the petition, Bearhouse had an ongoing banking relationship with National Bank of Commerce of Pine Bluff (NBC). In November of 1982, NBC made a "loan for working line of credit" in the sum of $4,000,000.00 to Bearhouse. This indebtedness was evidenced by a series of promissory notes dated from July 1985 through June 1987. The total outstanding unpaid balance due NBC as of April 1987 was $2,258,403.87.

Portland Bank, Portland, Arkansas, (Portland Bank) acted as agent for NBC to facilitate the various transactions. Typically, a transaction between these parties would occur as follows. Bearhouse would deliver to Portland Bank an endorsed negotiable warehouse receipt. Portland Bank would prepare a note payable to NBC. Bearhouse would execute the note and it would be forwarded to NBC. Portland Bank would retain the negotiable warehouse receipt at its place of business as a convenience to the parties. Upon receipt of the note, NBC would verify that Portland Bank held the warehouse receipts and deposit the note proceeds into Portland Bank's account at NBC to the credit of Bearhouse. Bearhouse would then draw the loan proceeds out of Portland Bank.

When Bearhouse desired to sell grain covered by a warehouse receipt, Portland Bank would surrender the warehouse receipt to Bearhouse. Bearhouse would execute and deliver to Portland Bank a document styled "trust receipt"[5] and then cancel the warehouse receipt on its books. As the various warehouse receipts were exchanged, the warehouse receipt number would be noted by the bank officer on a particular note.

NBC claims title to 3,069,030.00 pounds of rice based on negotiable warehouse receipts which were negotiated to NBC as collateral for a preexisting indebtedness. NBC claims that it is entitled to share pro rata with the other owners of rice from the sale by the trustee. NBC holds warehouse receipt No. 53 for 298,260.00 pounds, No. 59 for 1,333,300.00 pounds, No. 175 for

---

**5.** NBC does not assert in its brief any ownership rights by virtue of these trust receipts.

800,000.00 pounds, and No. 178 for 637,-470.00 pounds.

Farmers Rice Milling Company, Inc., (FRM) argues that NBC's claim of ownership is inferior to its claim because NBC did not give value for the negotiable warehouse receipt NBC possesses. FRM's argument is the same argument Ladd Farms makes against NBC's claim of ownership of soybeans. FRM's argument is rejected for the same reasons later discussed in "Ladd Farms' and NBC's Claims to Soybean Proceeds."

FRM also argues that the NBC's claim of lien and ownership is invalid because all of the security documents in NBC's possession were executed by only one officer of Bearhouse and that a resolution passed by the Board of Directors of Bearhouse required two signatures. NBC had in its possession a copy of the resolution requiring two signatures. Mr. Maxwell, an officer of NBC, testified that he had seen a more current resolution which required only one signature but could not produce a copy. No witness on behalf of Bearhouse testified that the resolution currently in effect required more than one signature. In the absence of more persuasive evidence, the Court accepts NBC's testimony as the most persuasive. Therefore, FRM's argument that NBC's claim of lien and ownership is invalid is rejected, and NBC's claim of ownership of 3,069,030.00 pounds of rice is allowed.

### Facts and Discussion as Related to Commodity Credit Corporation

Commodity Credit Corporation (CCC) is an agency of the United States. On July 1, 1985, Bearhouse entered into a "Uniform Rice Storage Agreement" (Agreement) with the CCC. Pursuant to the Agreement, CCC stored rice at Bearhouse's facilities at Portland, Arkansas, and the rice was considered commingled fungible goods pursuant to the Agreement. As evidence of CCC's ownership, Bearhouse issued thirty-two negotiable warehouse receipts to CCC for 5,906,807.00 pounds of rice. Prior to the filing of the bankruptcy petition, Bearhouse requested permission from CCC to move the CCC rice from its Portland facilities to its McGhee facilities. The procedure to move the rice required CCC to surrender the negotiable warehouse receipts to Bearhouse which voided the receipts. Bearhouse was supposed to issue new negotiable warehouse receipts to CCC when the rice was moved. Instead of moving the rice to McGhee, Bearhouse sold the rice to a third party, misappropriated the sale proceeds, and never reissued new negotiable warehouse receipts to CCC. CCC argues that it is entitled to share pro rata with all other owners of the rice which was sold by the trustee notwithstanding the fact that it does not possess any document of title.

Unlike the claim of NBC which owns rice represented by negotiable warehouse receipts for purposes of security, CCC is the outright owner of the rice. There is no requirement that an owner must possess its document of title on the day a bankruptcy petition is filed in order to prove ownership of rice. Bankruptcy Rule of Procedure 3001(g) states that a warehouse receipt constitutes prima facie evidence of the claim of ownership. The rule does not specifically require possession of the warehouse receipt. 7 U.S.C. § 263 (1978) requires that an owner surrender negotiable warehouse receipts before the owner is entitled to receive the grain represented by the receipts. As the trustee points out in his brief, it would be illogical for a claimant to be required to surrender the receipt in order to receive his grain and then forfeit his claim of ownership because he does not have possession of the warehouse receipt on the day a bankruptcy petition is filed. The evidence is not disputed that CCC had title to 5,906,807.00 pounds of rice on the day the petition was filed evidenced by negotiable warehouse receipts in the possession of Bearhouse. CCC's claim of ownership is allowed for 5,906,807.00 pounds of rice.

### Facts and Discussion as Related to Farmers Rice Milling Company, Inc.

In 1986 and early 1987 Farmers Rice Milling Company, Inc., (FRM) of Lake

**563**

Charles, Louisiana, entered into several contracts for the purchase of rice from Bearhouse, four of which are relevant to this discussion. The first transaction in question was evidenced by a contract dated October 14, 1986, for the purchase of 1,350,000.00 pounds of rice by FRM. The agreed price was "U.S. $.79 PER 100 LBS. NET, BULK, DELIVERED LAKE CHARLES, LA. OVER WORLD MARKET PRICE." Delivery was to be complete by December 1, 1986. This contract is referred to as an "open contract" because no advance payment was made on the contract by FRM. As evidence of the three other contracts, Bearhouse issued to FRM negotiable warehouse receipts as follows:

No. 45, October 23, 1986—4,500,000.00 pounds
No. 46, November 6, 1986—1,500,000.00 pounds
No. 61, February 6, 1987—5,000,000.00 pounds

When FRM received warehouse receipt No. 45, it wire transferred the sum of $187,200.00 to First State Bank of Crossett to the credit of Bearhouse. When FRM received warehouse receipt No. 46, it wire transferred the sum of $64,800.00 to Simmons Bank, Pine Bluff, Arkansas, to the credit of Bearhouse. When FRM received warehouse receipt No. 61, it wire transferred the sum of $246,000.00 to NBC to the credit of Bearhouse. Included in the $246,-000.00 payment were advance storage charges through March 15, 1987, of $7,500.00 in connection with the rice covered by warehouse receipt No. 61.

Between the dates of January 19, 1987, and February 9, 1987, Bearhouse shipped 2,490,740.00 pounds of rice to FRM. FRM was required to surrender the warehouse receipts before Bearhouse could lawfully ship any rice due pursuant to the warehouse receipts. FRM, prior to receipt of any rice, surrendered warehouse receipt Nos. 45 and 46 to Bearhouse and requested delivery. FRM credited the rice it received against the obligation evidenced by warehouse receipt No. 61. FRM claims ownership to 8,509,260.00 pounds of rice evidenced by the three warehouse receipts

and crediting 2,490,740.00 pounds received against warehouse receipt No. 61. The trustee argues that out of the 2,490,740.00 pounds of rice shipped, 1,350,000.00 pounds should be credited against the October 14, 1986, open contract and that FRM owes Bearhouse $114,747.00 for the 1,350,000.00 pounds of rice it received. The trustee asserts a right of setoff in this amount. FRM argues that the open contract dated October 14, 1986, is void because Bearhouse failed to deliver the rice by December 1, 1986, as agreed.

FRM argues that it should be considered as a buyer in the ordinary course of business of fungible goods sold and delivered by a warehouseman. Under A.C.A. § 4–7–205 (1987) a buyer in the ordinary course of business acquires title from a seller free and clear of other claims of ownership even if evidenced by documents of title. See Farm Bureau Mut. Ins. Co. v. Wright, 285 Ark. 228, 686 S.W.2d 778, 782 (1985); Jamestown Farms Elevator, Inc., 49 B.R. 661 (Bankr.N.D.1985). Under Arkansas law, a sale consummates in the passing of title to the buyer. A.C.A. § 4–2–106(1) (1987).[6] A.C.A. § 4–2–401(2) (1987) provides in part as follows:

(2) Unless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods ... even though a document of title is to be delivered at a different time or place.

The documentary evidence introduced indicates that FRM and Bearhouse agreed, as to the rice evidenced by receipt Nos. 45 and 46, that delivery was to be accomplished F.O.B. at seller's elevator, McGhee, Arkansas. FRM applied the 2,490,740.00 pounds of rice it received to the obligation of Bearhouse under warehouse receipt No. 61 because it was F.O.B. at Lake Charles and the 2,490,740.00 pounds of rice arrived in Louisiana with the freight prepaid. This act is inconsistent

6. This section was amended by Act 401 (1981) of the Acts of Arkansas and provides that a buyer of rice in the ordinary course of business does not take title free and clear of claims under a warehouse receipt. However, as discussed previously in detail, this amendment does not apply to federally licensed warehouses.

with FRM's continued possession of warehouse receipt No. 61 which is required to be surrendered before rice can be delivered. However, the conduct of the parties is also inconsistent with some of the other evidence concerning when title to the goods was to pass. The Court is persuaded that the correct interpretation of the agreement between FRM and Bearhouse regarding the rice represented by all three negotiable warehouse receipts was that title to the rice would pass upon the acquisition of each negotiable warehouse receipt rather than upon delivery of the rice. All of the warehouse receipts were delivered to FRM prior to delivery of the rice and prior to the filing of the bankruptcy petition. Payment for the rice was made substantially contemporaneously with delivery of the three negotiable warehouse receipts. The evidence further establishes that as soon as FRM acquired title to the rice it entered into a storage contract with Bearhouse. On the day the petition was filed, FRM was the owner of 8,509,260.00 pounds of rice which was all stored at Bearhouse's facilities.

NBC argues that because warehouse receipts Nos. 45 and 46 were stamped "void" by Bearhouse and were surrendered by FRM in anticipation of delivery of the grain, FRM's claim of ownership as to the rice represented there is void. A.C.A. § 4–7–403(3) (1987) and the applicable federal statutes, 7 U.S.C. § 241, *et seq.*, make it mandatory for the receipt holder to surrender the receipt in order to obtain delivery of the rice. This argument is rejected for the same reasons discussed in "Facts and Discussion as Related to Commodity Credit Corporation." There is no bona fide dispute that FRM was the owner of the rice represented by warehouse receipt Nos. 45, 46 and 61.

The trustee's argument that the rice which was delivered to FRM should be credited against the "open contract" of October 14, 1987, is also without merit. The claim is based on inequitable and manipulative book entries by Bearhouse and not based on any agreement of the parties.

FRM's claim of ownership of 8,509,260.-00 pounds of rice is allowed.

## V

### PRIORITIES OF ALL CLAIMANTS TO RICE SOLD BY TRUSTEE

Since there is a shortage of rice to cover the claims of ownership, the priority of claims of ownership in the available rice proceeds is governed by A.C.A. § 4–7–207(2) (1987) which provides as follows:

Fungible goods so commingled are owned in common by the persons entitled thereto and the warehouseman is severally liable to each owner for that owner's share. Where because of overissue a mass of fungible goods is insufficient to meet all the receipts which the warehouseman has issued against it, the persons entitled include all holders to whom overissued receipts have been duly negotiated.

The sale proceeds of the 10,196,790.00 pounds rice sold by the trustee shall be distributed as follows:

1. Cost of sale including trustee's commission;

2. Net proceeds from C series and H series bins at Hamburg to Scott Young;

3. Net proceeds from Bin 4 and in the two rail cars located at McGhee, Arkansas, to Shrum.

4. Balance of rice proceeds to be divided pro rata among the following claimants:

| | |
|---|---|
| NBC | 3,069,030.00 pounds |
| CCC | 5,906,870.00 pounds |
| FRM | 8,509,260.00 pounds |

## VI

### MONTICELLO GIN AND ELEVATOR COMPANY'S, NATIONAL BANK OF COMMERCE OF PINE BLUFF'S AND T.K. WOODS AND RICHARD WOODS' CLAIMS TO PROCEEDS FROM THE SALE OF OATS

Monticello Gin and Elevator Company (Monticello Gin) is a company engaged in the gin and elevator business located at Epps, Louisiana. In January 1987, Bearhouse contacted Monticello Gin and entered into an oral contract to purchase a quantity of oats for $1.50 per bushel. Pursuant to

an oral contract, 24,000.00 bushels of oats, valued at $34,000.00 were delivered to Bearhouse's facilities at Hamburg, Arkansas, between the dates of January 9, 1987, and January 30, 1987. Monticello Gin received scale tickets as evidence of the shipment. The oats were placed in Bins 1 and 13 at Hamburg, Arkansas, and, according to the testimony, were not commingled with any other oats. Ken Frith, an employee of Monticello Gin, testified that on February 22, 1987, he made oral demand on Bearhouse for payment or return of the oats.

■ Monticello Gin claims that it is entitled to the sale proceeds of the oats located at Hamburg, Arkansas, in Bins 1 and 13 because of its demand for reclamation. As discussed previously, A.C.A. § 4–2–702 (1987) and 11 U.S.C. § 546(c) and (d) govern the reclamation right of a seller of grain. Both statutes require that the demand for return of the grain be made within ten days of delivery. Since, the demand was made twenty-three days after the last delivery Monticello Gin does not possess a right to reclaim. *See In re Fairfield Elevator Co., Inc.*, 14 U.C.C. 96 (S.D.Iowa 1973). Monticello Gin's claim of ownership in the proceeds of the oats is denied.

NBC holds warehouse receipt Nos. 48, 55 and 77 for 39,100.00 bushels of oats as collateral for preexisting loans. The objections to NBC's claim of ownership of oats evidenced by negotiable warehouse receipts are the same objections raised by FRM and Ladd Farms and are discussed under separate headings in this opinion. These arguments as it pertains to oats are rejected for the same reasons stated elsewhere in this memorandum opinion.

The total oats sold by the trustee according to the Trustee's Report of Sale was 54,163.49 bushels. NBC is the owner of 39,100.00 bushels and holds a valid first lien in the balance of the proceeds of the oats by virtue of properly executed and filed financing statements and security agreements.

T.K. Woods and Richard Woods appeared at trial pro se and asserted a claim to the proceeds of the sale of oats. Their evi-

dence establishes a general unsecured claim against Bearhouse and not a claim of ownership to the proceeds from the sale of the oats.

Therefore, proceeds from the sale of the oats should be distributed as follows:

(a) net proceeds of sale of 39,100.00 bushels to NBC.

## VII

## LADD FARMS' AND NBC' CLAIMS TO PROCEEDS FROM SALE OF SOYBEANS

Earl Ladd (Ladd) is a farmer who lives and farms in Ashley County, Arkansas. He farms as Ladd Farms, a partnership with his three sons. During the crop year 1986, Ladd Farms produced a soybean crop on land rented from six different landlords. Ladd Farms paid a crop share of one-fifth to some landlords and one-fourth to other landlords. Ladd Farms delivered 31,661.10 bushels of soybeans to Bearhouse for storage. Pursuant to an agreement between Ladd Farms and one landlord, 4,461.29 bushels of soybeans were sold, and 27,199.-81 bushels remained in storage at Bearhouse.

In mid-February 1987, Ladd learned that Bearhouse was in financial trouble and retrieved 2,803.33 bushels of soybeans. According to Ladd, Ladd Farms had 23,074.00 bushels of soybeans in storage at Bearhouse's facilities on the day the bankruptcy petition was filed.

Ladd Farms argues that 11 U.S.C. §§ 507(a) and 557 grant to producers of grain a priority over all other owners of commingled fungible goods. Ladd Farms argues alternatively that its claim to the soybean proceeds is superior to the claim of NBC because NBC did not give value for the negotiable warehouse receipts it possesses.

Ladd Farms has cited the case of *In re Esbon Grain Co., Inc.*, 55 B.R. 308 (Bankr. D.Kan.1985), *aff'd*, 72 B.R. 528 (D.Kan. 1987) in support of its claim of priority under §§ 507(a), 546 and 557. The Bankruptcy Court in *Esbon* determined that

owner/producers of grain were entitled to priority over a bank which held a preexisting perfected lien by virtue of financing statements and security agreements because of a perceived Congressional intent in the 1984 Bankruptcy Amendments that producers of grain be granted a priority. *Esbon* is factually distinguishable because the bank in *Esbon* did not claim ownership based on a negotiable warehouse receipt. Furthermore, this Court is not persuaded by the bankruptcy court's reasoning in *Ebson* because there is absolutely nothing in the Bankruptcy Code which can reasonably be construed to establish priorities among owners or lienholders of commingled fungible goods.

■ State law, rather than the Bankruptcy Code, determines the priority of liens and what constitutes property of the estate in this case. *See Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed. 2d 136 (1979); *In re Schauer*, 835 F.2d 1222 (8th Cir.1987). A.C.A. § 4–7–207(2) (1987) establishes ownership priorities in fungible goods where the claims of ownership exceed the amount of available goods. This section clearly states that all owners of commingled fungible goods are tenants in common and share pro rata in any distribution of grain when there is a shortage.

■ Ladd Farms' argument that NBC's claim of ownership is void because of a failure of consideration is also without merit. Bearhouse endorsed and delivered negotiable warehouse receipt Nos. 49, 51, 176, 179 to NBC as security for a preexisting indebtedness. These warehouse receipts evidence ownership of 29,602.00 bushels of soybeans. Although a warehouseman is not the owner of stored grain, it has apparent authority to vest the incidence of ownership in another by the issuance of a negotiable warehouse receipt. *See* Anderson, *Uniform Commercial*, Vol. 3 § 7–502:4, at 624 (1970); White, Summers, *Uniform Commercial Code*, Sec. 20–4, at 800, 801 (1980). A.C.A. § 4–7–502(1) (1987) states that a holder to whom a negotiable document of title has been duly negotiated acquires title to the document and title to the goods. *See also Jones v. One Fifty Foot Gulfstar, Etc.*, 625 F.2d 44, 48 (5th Cir.1980). Title to the goods is also transferred when the negotiable warehouse receipt is negotiated to a holder as collateral for a loan. *In re Fairfield Elevator Co., Inc.*, 14 U.C.C.Rep. at 96.

Therefore, Ladd Farms claim of ownership of 23,074.00 bushels of soybeans and NBC's claim of ownership of 29,602.00 bushels of soybeans are allowed.

There was some evidence of a right of setoff in favor of the estate against the claims of Ladd Farms and an alleged cause of action for a preference under 11 U.S.C. § 547. These issues are not properly part of this proceeding and the Court declines to make any determination at this time, however, Ladd Farms' share should not be distributed until these issues are resolved. The trustee is ordered to deposit all sums awarded Ladd Farms in an interest bearing account pending further orders of this Court.

Therefore, proceeds from the sale of the soybeans should be distributed as follows:

(a) Balance of net proceeds pro rata between:

| | | |
|---|---|---|
| Ladd Farms | 23,074.00 | bushels [7] |
| NBC | 29,602.00 | bushels |
| Buddy White | 253.44 | bushels [8] |

### SUMMARY

The trustee is ordered to make distribution of the proceeds from the sale of all of the grain as follows:

1. Costs of sale including trustee's commission;

2. Rice proceeds:

(a) net proceeds from C series and H series bins near Hamburg to Scott Young;

(b) net proceeds from Bin 4 and in the two rail cars located at McGhee to Shrum; and

---

7. Includes claims of landlords of Ladd Farms.

8. This claim was not disputed by any of the parties and its merit is not separately discussed.

(c) balance of net rice proceeds to be divided pro rata between:

NBC 3,069,030.00 pounds
CCC 5,906,870.00 pounds
FRM 8,509,260.00 pounds

3. Oat proceeds:

(a) net proceeds of sale of 39,100.00 bushels to NBC

4. Soybean proceeds:

Balance of net proceeds pro rata between:

Ladd Farms 23,074.00 bushels [9]
NBC 29,602.00 bushels
Buddy White 253.44 bushels [10]

The trustee is ordered to calculate the dollar value of the distribution in accordance with this memorandum opinion. After notice and an opportunity to object, the trustee shall distribute the proceeds pursuant to further order of this Court.

IT IS SO ORDERED.

---

9. Includes claims of landlords of Ladd Farms.

10. This claim was not disputed by any of the parties and its merit is not separately discussed.