In re Jerry William CHILDRESS d/b/a Childress Grain Company, d/b/a Grain Train & Minnie Agnes Childress, Debtors.

Bankruptcy No. 95–20117–C–11.

United States Bankruptcy Court,
W.D. Missouri,
Central Division.

May 25, 1995.

Jerry W. Venters, Jefferson City, MO, for debtors.

Craig F. Martin, Asst. Atty. Gen., Jefferson City, MO, for Missouri Dept. of Agriculture.

## ORDER GRANTING MOTION FOR RELIEF FROM AUTOMATIC STAY FILED BY THE MISSOURI DEPARTMENT OF AGRICULTURE

FRANK W. KOGER, Chief Judge.

This matter is before the Court on the motion for expedited hearing pursuant to 11 U.S.C. § 557 and motion for relief from the automatic stay filed by the Missouri Department of Agriculture (Department). A hearing was held on April 19, 1995. After considering the arguments of counsel, reading the

briefs submitted by the parties, and independently researching the issues presented, the Court grants the Department's motion for relief from the automatic stay.

## FACTS

The joint debtors, Jerry William Childress and Minnie Agnes Childress, d/b/a Childress Grain Company and d/b/a Grain Train, own grain elevators in Auxvasse, Missouri and Baring, Missouri. The Childresses operated the Auxvasse elevator from 1986 until 1994 and operated the Baring elevator from 1978 until 1994. The Childresses were licensed in Missouri to conduct business as a grain warehouse and grain dealer. On or about June 27, 1994, pursuant to an order signed by Judge Roper of Callaway County, the Department took possession of the Childresses' grain elevator in Auxvasse. On or about June 28, 1994, pursuant to an order signed by Judge Lewis of Knox County, the Department took possession of the Childresses' grain elevator in Baring.

The court orders authorized the Department to take possession of the Childresses' records, to liquidate the grain-related assets, and to deposit the proceeds therefrom in an interest-bearing escrow account. The Department seized and took possession of all known grain-related assets. Subsequently, grain claimants submitted affidavits of claim with the Department, which detailed the amount and type of grain that was sold to the Childresses priced and unpaid, or deposited in open storage. The Department confirmed all the claims that were filed. An administrative hearing was held on November 22, 1994, to determine the validity and amount of grain-related claims, the applicability of funds held in escrow, and to determine the distribution of the proceeds from the escrow account. The parties each appeared by counsel at the hearing. On January 23, 1995, the hearing officer determined that all claimants of record should be reimbursed according to formulas set forth by the Department and introduced as evidence at the hearing. The hearing officer entered an order accordingly. No party or claimant filed an appeal within 30 days of the effective date of the hearing officer's order, which became final pursuant to Missouri law.

On March 1, 1995, the Department filed a motion to distribute grain-related assets in the Circuit Court of Callaway County. On March 2, 1995, the Childresses filed a joint voluntary petition under Chapter 11 of the Bankruptcy Code, which stayed the Department's proceedings. In their amended schedule E, the Childresses list grain claimants holding undisputed, unsecured claims in the total amount of $404,618.78. Of that amount, the Childresses contend that $122,140.59 is entitled to priority under 11 U.S.C. § 507(a)(5)(A). In their schedules, the Childresses list total assets of $882,692.63, which includes an allocation of $432,792.63 to assets seized by the Department. The Childresses list total liabilities, including the grain claimants, of $963,412.04 of which $361,314.00 is secured debt. Unsecured priority claims for wages and taxes total $6064.30. Unsecured nonpriority claims, excluding any unsecured nonpriority portion of the grain claimants' claims, total $191,414.96.

The Department is currently holding $405,070.66, which consists of bond proceeds in the amount of $145,278.03; grain proceeds from the sale of grain in the amount of $249,092.00; and grain-related assets, including funds from the Childresses' checking account and any other funds in their possession that were related to the business, in the amount of $10,699.64. The funds being held by the Department are sufficient to satisfy the grain claimants' claims in full.

On March 14, 1995, the Department filed a motion for expedited hearing pursuant to 11 U.S.C. § 557 and for relief from the automatic stay. Attached to the motion is a certificate of service which shows that all of the Childresses' creditors, including each secured creditor, listed in the bankruptcy schedules received notice of the motion. In its motion, the Department contends that the funds in its possession are not property of the bankruptcy estate and requests relief from the automatic stay to allow the Department to disburse the funds in accordance with the hearing officer's order and Missouri law. The Childresses concede that the bond proceeds are not property of the estate and may

properly be distributed to the grain claimants by the Department, which narrows the controversy to the proceeds from the sale of grain and other grain-related assets.

It is the Childresses' position that the Department's proposal to distribute the funds in question to the grain claimants violates the provisions of the Bankruptcy Code. The Childresses assert that the funds are property of the bankruptcy estate and must be turned over to them as debtors-in-possession; that after a reduction of their claims for payments received from the bond proceeds, the grain claimants would have a priority claim pursuant to section 507(a)(5)(A) in an amount not to exceed the greater of $4000 or the remaining amount of each claim; and that if the payment from the bond proceeds and the priority payment does not satisfy the grain claimants' claims, the grain claimants must share in a pro rata distribution from the bankruptcy estate along with other general unsecured creditors.

The Department argues that the funds at issue are not property of the bankruptcy estate because under Missouri law the grain claimants were bailors who are entitled to recover their property or proceeds from the Childresses, the Childresses acquired no ownership interest in the grain as a result of the bailment relationship, and the Childresses had no ownership interest in the funds at the time the bankruptcy was filed. The Department contends that the full amount of the funds should be paid out to the grain claimants and asserts that its proposed distribution is not limited in any way by the Bankruptcy Code. The Department argues that the grain claimants are entitled to distribution of the funds under 11 U.S.C. § 557 and that all of the funds must be paid out to the grain producers pursuant to the section 557 motion "to preclude 'forced sharing' by producers/depositors with other non-producer creditors." The Department argues that:

> [b]ankruptcy courts are mandated to order distribution of non-estate property, such as the stored grain, ... to producers/depositors before distribution to the debtor's other creditors. To the extent that a producer does not recover the full amount of his grain claim by way of § 557 expedited

procedures, the producer holds an allowed unsecured claim with respect to which § 507(a)(5) provides a $4,000 maximum fifth priority.

No secured creditor, nor any other creditor, has filed an objection to the Department's motion to lift the automatic stay. No creditor, other than the grain claimants, has claimed an interest in the funds being held by the Department.

## DISCUSSION

■ The starting point for the Court's analysis is 11 U.S.C. § 557, which states:

**Expedited determination of interests in, and abandonment or other disposition of grain assets.**

(a) This section applies only in a case concerning a debtor that owns or operates a grain storage facility and only with respect to grain and the proceeds of grain. This section does not affect the application of any other section of this title to property other than grain and proceeds of grain.

(b) In this section—

(1) "grain" means wheat, corn, flaxseed, grain sorghum, barley, oats, rye, soybeans, other dry edible beans, or rice;

(2) "grain storage facility" means a site or physical structure regularly used to store grain for producers, or to store grain acquired from producers for resale; and

(3) "producer" means an entity which engages in the growing of grain.

(c)(1) Notwithstanding sections 362, 363, 365, and 554 of this title, on the court's own motion the court may, and on the request of the trustee or an entity that claims an interest in grain or the proceeds of grain the court shall, expedite the procedures for the determination of interests in and the disposition of grain and the proceeds of grain, by shortening to the greatest extent feasible such time periods as are otherwise applicable for such procedures and by establishing, by order, a timetable having a duration of not to exceed 120 days for the completion of the applicable procedure specified in subsection (d) of this section. Such time periods and such timetable may be modified by the court, for

cause, in accordance with subsection (f) of this section.

(2) The court shall determine the extent to which such time periods shall be shortened, based upon—

(A) any need of an entity claiming an interest in such grain or the proceeds of grain for a prompt determination of such interest;

(B) any need of such entity for a prompt disposition of such grain;

(C) the market for such grain;

(D) the conditions under which such grain is stored;

(E) the costs of continued storage or disposition of such grain;

(F) the orderly administration of the estate;

(G) the appropriate opportunity for an entity to assert an interest in such grain; and

(H) such other considerations as are relevant to the need to expedite such procedures in the case.

(d) The procedures that may be expedited under subsection (c) of this section include—

(1) the filing of and response to—

(A) a claim of ownership;

(B) a proof of claim;

(C) a request for abandonment;

(D) a request for relief from the stay of action against property under section 362(a) of this title;

(E) a request for determination of secured status;

(F) a request for determination of whether such grain or the proceeds of grain—

(i) is property of the estate;

(ii) must be turned over to the estate; or

(iii) may be used, sold, or leased; and

(G) any other request for determination of an interest in such grain or the proceeds of grain;

(2) the disposition of such grain or the proceeds of grain, before or after determination of interests in such grain or the proceeds of grain, by way of—

(A) sale of such grain;

(B) abandonment;

(C) distribution; or

(D) such other method as is equitable in the case;

(3) subject to sections 701, 702, 703, 1104, 1202, and 1302 of this title, the appointment of a trustee or examiner and the retention and compensation of any professional person required to assist with respect to matters relevant to the determination of interests in or disposition of such grain or the proceeds of grain; and

(4) the determination of any dispute concerning a matter specified in paragraph (1), (2), or (3) of this subsection.

(e)(1) Any governmental unit that has regulatory jurisdiction over the operation or liquidation of the debtor or the debtor's business shall be given notice of any request made or order entered under subsection (c) of this section.

(2) Any such governmental unit may raise, and may appear and be heard on, any issue relating to grain or the proceeds of grain in a case in which a request is made, or an order is entered, under subsection (c) of this section.

(3) The trustee shall consult with such governmental unit before taking any action relating to the disposition of grain in the possession, custody, or control of the debtor or the estate.

(f) The court may extend the period for final disposition of grain or the proceeds of grain under this section beyond 120 days if the court finds that—

(1) the interests of justice so require in light of the complexity of the case; and

(2) the interests of those claimants entitled to distribution of grain or the proceeds of grain will not be materially injured by such additional delay.

(g) Unless an order establishing an expedited procedure under subsection (c) of this section, or determining any interest in or approving any disposition of grain or the proceeds of grain, is stayed pending appeal—

(1) the reversal or modification of such order on appeal does not affect the validity of any procedure, determination, or disposition that occurs before such reversal or modification, whether or not any entity knew of the pendency of the appeal; and

(2) neither the court nor the trustee may delay, due to the appeal of such order, any proceeding in the case in which such order is issued.

(h)(1) The trustee may recover from grain and the proceeds of grain the reasonable and necessary costs and expenses allowable under section 503(b) of this title attributable to preserving or disposing of grain or the proceeds of grain, but may not recover from such grain or the proceeds of grain any other costs or expenses.

(2) Notwithstanding section 326(a) of this title, the dollar amounts of money specified in such section include the value, as of the date of disposition, of any grain that the trustee distributes in kind.

(i) In all cases where the quantity of a specific type of grain held by a debtor operating a grain storage facility exceeds ten thousand bushels, such grain shall be sold by the trustee and the assets thereof distributed in accordance with the provisions of this section.

Also relevant for the Court's consideration is section 507(a)(5)(A), which provides:

(a) The following expenses and claims have priority in the following order:

. . . .

(5) Fifth, allowed unsecured claims of persons—

(A) engaged in the production or raising of grain, as defined in section 557(b) of this title, against a debtor who owns or operates a grain storage facility, as defined in section 557(b) of this title, for grain or the proceeds of grain

. . . .

but only to the extent of $4,000 for each such individual.

Sections 507(a)(5) and 557 were added to the Bankruptcy Code when the Code was amended in 1984. The legislative history of sections 557 and 507(a)(5) shows that each was added to the Bankruptcy Code in response to a grain elevator bankruptcy problem.[1] In his comments to the House of Representatives urging that the proposed amendments be passed, Representative Glickman stated that special considerations should be given to farmers over other creditors in grain elevator bankruptcies because farmers are in a unique situation as a result of a number of factors:

No. 1, it can be extremely difficult to maintain the quality of stored grain for prolonged periods of time; that makes the asset in question unique.

No. 2, as those of us farm country know all too well, grain markets fluctuate greatly and quickly. That makes the timing of a sale critical to the return a farmer receives on his investment. Clearly, that is not the case with most creditors.

No. 3, farmers often have little or no choice as to what elevator they are going to use. That is not the case for other types of creditors which might be involved in these cases.

No. 4, the priority provided under the bill extends only to farmers as bailors. That basically means that they had grain stored at the elevator and nothing more. So what happens to them in a bankruptcy when the grain is gone is very similar to what an individual would encounter if he had taken his car to a garage, the garage went bankrupt and, in the process, had sold or in some other way gotten rid of his

---

1. 11 U.S.C. § 546(d) was also amended in 1984 "to provide greater reclamation protection for producers who have sold grain to an insolvent elevator but have not received payment." S.Rep. No. 65, 98th Cong., 1st Sess. 65 (1983) (Senate Report accompanying S 445, Omnibus Bankruptcy Improvements Act of 1983), *reprinted in* Norton Bankruptcy Code Pamphlet, Bankruptcy Code, p. 582 (1994–95 ed.). Subdivision (g) was added to Fed.R.Bankr.P. 3001 by the 1984 Bank- ruptcy Amendments. Rule 3001(g) "provides that warehouse receipts, scale tickets, or similar documents routinely issued as evidence of title by a grain storage facility constitute a prima facie evidence of the validity and the amount of a claim of ownership of the quantity of the grain placed in storage." Norton Bankruptcy Code Pamphlet, Bankruptcy Rules, p. 189 (1994–95 ed.).

car. Clearly, instances like that warrant special consideration.

No. 5, I would point out that, as is the case with other priorities in the Bankruptcy Code, this priority is limited to $2,000 [raised to $4000 by the Bankruptcy Reform Act of 1994].

I hope those five points clarify the legitimate need for special consideration of farmers' claims in these bankruptcies.

130 Cong.Rec. H1816, 1817 (daily ed. March 21, 1984), remarks of Rep. Glickman, *reprinted in* Norton Bankruptcy Code Pamphlet, Bankruptcy Code, pp. 646–47 (1994–95 ed.) [Hereinafter 130 Cong.Rec.].

Representative Glickman continued:

I would stress to my colleagues that it is not unusual; in fact, it is almost commonplace given the economic situation facing our farmers today, for an entire season's, if not an entire lifetime's work product to be stored in an elevator and tied up or lost— in a bankruptcy.

To address this problem, subtitle B of title II of the bill before us makes a number of modifications in the Bankruptcy Code to reflect the particular problems and circumstances inherent in a grain elevator bankruptcy. Let me go through each of them for you:

Status of Farmer Claims

The bill adds a new listing to present priorities used to determine the division of the assets of the bankrupt. According to the bill, individuals engaged in the production or raising of grain, who had grain stored in the elevator and were not able to fully recover that grain due to shortages, have their claims met seventh, at the end of the existing list of priorities, and before general, unsecured creditors. Current law does not accord farmers any special status in the division of the assets of the estate if they suffer a loss due to grain shortages; they must have their claims satisfied in the same manner as general, unsecured creditors which generally means their claims are prorated along with other claims. The bill provides that the special priority applies only to the first $2,000 [now $4000] of an individual farmer's claim.

. . . .

Expediting the Determination of Ownership of Stored Grain

The bill establishes a 120–day timetable for the determination of interests in and disposition of grain and proceeds of the grain. The timetable is activated by the court's own motion, a motion of the trustee, or a motion of any entity with an interest in the grain. Several procedures and determinations may be expedited under the timetable, including a claim of ownership, a proof of claim, a request for relief from a stay of action, a request for determination of secured status, and requests for determinations of whether the grain is the property of the estate, may be turned over to the estate, or may be used, sold, or leased. The timetable may also apply to the disposition of the grain, including the sale, abandonment, or distribution of the grain. The court may extend the timetable beyond the 120–day limit if it finds that the case is especially complex and the interests of the claimants entitled to the grain or grain proceeds will not be materially injured.

. . . .

In closing, let me remind my colleagues that legislation similar to this bill has passed the Senate without dissent five times in the recent past. That in itself should allay any concerns of controversy about these provisions. I also think it points up the strong concern across rural America about this problem and the need to resolve it quickly. In HR 5174, we have a workable reasonable solution to the problem. It goes far enough to effectively help farmers who find themselves in this situation while still preserving the basic concepts of the Bankruptcy Code.

130 Cong.Rec. at 1817, *reprinted in* Norton Bankruptcy Code Pamphlet, Bankruptcy Code, pp. 647–49 (1994–95 ed.).

Here, the parties do not dispute that the Childresses' grain elevators are grain storage facilities and that the grain claimants are producers within the meaning of section 557(b)(2) and (b)(3).

The leading case which supports the proposition that the grain claimants must be paid

in full ahead of all other creditors is *In re Esbon Grain Co., Inc.*, 55 B.R. 308 (Bankr. D.Kan.1985). In *Esbon* the Chapter 7 debtor was in the business of buying, selling, and storing grain and related supplies. The debtor had executed security agreements and financing statements creating a lien in favor of The First National Bank of Smith Center, Kansas (Bank) by way of a security interest in " 'all grain, or contract rights now owned or hereafter acquired.' " Both prior and subsequent to the execution of the security agreement the debtor, in the ordinary course of business, received grain delivered by grain producers and issued scale tickets and warehouse receipts therefor. Many of the warehouse receipts specified " 'open storage,' " which permitted the debtor to commingle grain owned by the grain depositors with grain owned by the debtor. When the debtor filed for Chapter 7 relief, the quantity of grain on hand in storage was substantially less than the total represented by outstanding receipts, scale tickets, and lien pledges to the Bank.

The Trustee filed an objection to the secured claim of the Bank. The bankruptcy court noted that problems are created for farmers when a grain elevator files for bankruptcy protection because "a particular grain depositor is denied his right to a physical redelivery of like grain in kind because the entire amount in storage is 'property of the estate' by virtue of the debtor's possession and lien for storage fees." *Id.* at 310 (citing *State of Missouri v. United States Bankruptcy Court for the E.D. of Ark.*, 647 F.2d 768, 774 (8th Cir.1981), *cert. denied*, 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982)). The bankruptcy court framed the issue as a controversy between the rights of grain depositors and the rights of the holder of a security interest in stored grain belonging to the warehouseman. The bankruptcy court stated that the issue appeared to be of first impression under the 1984 Amendments to the Bankruptcy Code and gave considerable weight to the legislative history of sections 236, 235, and 237 of the Omnibus Bankruptcy Improvements Act of 1983, which was a predecessor to the bill passed by Congress in 1984. The court opined:

There is practically no legislative history specifically attributed to those 1984 Code sections 546(d), 557 and 507(a)(5). However they are essential counterparts of sections 236, 235 and 237, respectively, of the Omnibus Bankruptcy Improvements Act of 1983 passed by the Senate as S. 445. The latter was the product of extensive Senate hearings and findings which provide an appropriate and useful guide for an interpretation of the 1984 enactments.

Following is an excerpt from S.Rep. No. 98–65, 98th Cong., 1st Sess., p. 25, The Omnibus Bankruptcy Improvements Act of 1983, report of the Committee on the Judiciary United States Senate:

Testimony before the Subcommittee on the Courts established that the following problems, encountered in the James Brothers cases, have repeatedly hindered the proper distribution of farm produce located in storage facilities that are the subject of proceedings in bankruptcy:

. . . .

(3) *the requirements of present law which mandate that owners of crop assets held by the debtor solely on the basis of his status as a bailee must share grain assets held by the trustee in bankruptcy on a pro rata basis with any creditor holding a security interest in assets of a similar type which are owned by the debtor, such that the bailors of such storage contract crop assets have the value of their property diminished for the benefit of such creditors when there is a shortage of produce on hand;*

(4) *the unprotected status, as unsecured creditors in bankruptcy, of farmers who have sold crops to a farm produce storage facility but have not received payment for that crop;*

(5) *the reluctance of some courts to accept warehouse receipts and scale tickets, the principle [sic] documents used in warehouse business to establish record of ownership of crop assets stored in warehouse facilities on bailment contracts, as evidence of ownership in bankruptcy abandonment proceedings;*

. . . .

*Id.* (emphasis supplied by the Court). There is an obvious correlation of paragraph (4) above with 1984 section 546(d) and of paragraphs (3) and (5) with 1984 sections 557 and 507(a)(5). The Senate report further states that the Committee bill would accomplish the following to alleviate the above-described problems:

. . . .

(2) *The bill would require the court to distribute grain assets or the proceeds of such assets first to producers who have merely stored their grain in such a facility upon a contract of bailment;*

. . . .

(5) *The bill contains measures which would strengthen present provisions of the Code allowing a right of reclamation to producers who have sold goods to a debtor in bankruptcy who have not received payment;*

(6) *The bill contains measures requiring the bankruptcy court to accept valid warehouse receipts and scale tickets as proof of ownership of crop assets possessed by the debtor upon contracts of bailment where they were issued for that purpose;*

. . . .

(8) *The bill grants farm producers a priority position in the distribution of assets of the bankrupt to general unsecured creditors when those farm producers have suffered a loss as a result of the sale or conversion of farm produce to or by a debtor operating a storage facility, after trustee and court expenses, wages of employees, and pension plan payments.*

*Id.,* at 26. (emphasis supplied by the Court.) Once again there is an identification of those comments with the 1984 amendments: paragraph (5) with section 546(d); paragraphs (2) and (6) with section 557; and paragraph (8) with section 507(a)(5).

The Bill referred to in the Senate report was later passed, with very little change, by Congress as the 1984 Amendments. Consequently, as indicated above, the legislative history of Senate Bill 445, 98th Cong. 1st Sess., seems material in interpreting the 1984 Amendments.

*Id.* at 313–14.

The Bank argued that lien rights against the warehouseman's own stored grain were on an equal footing with the rights of grain depositors holding warehouse receipts or scale tickets and that all must share pro rata when there is an overall shortage of grain in the storage facility. The bankruptcy court rejected the argument stating that by reason of the 1984 Amendments:

a grain producer/depositor's rights no longer may be treated on a parity with those of a secured creditor. The expedited procedures of section 557 were intended to preclude any such "forced sharing" by producer/depositor with secured lenders. Bankruptcy courts are mandated to order distribution of the stored grain (or proceeds) to the producer/depositor *before* distribution to debtor's secured creditors. And it seems intended that that sequential priority applies in instances of shortfall: After payment of trustee costs all grain is committed to the bailment claims of producer/depositors, thus shifting the loss to debtor's secured creditors.

. . . .

To be read in *pari materia* is the 1984 Amendment of section 507(a)(5). To the extent a producer does not recover the full amount of his grain by way of section 557 expedited procedures, the producer holds an allowed unsecured claim with respect to which section 507(a)(5) provides a $2,000 maximum fifth priority. In that fashion section 507(a)(5) comes into play after the distribution under section 557. Any unsecured shortage remaining after the $2,000 priority payment is relegated to a general unsecured status to share equally with other like claims in the residue of the estate.

*Id.* at 314–15 (emphasis in original).

The bankruptcy court sustained the Trustee's objection to the Bank's secured claim and concluded that the allowed claims of grain producer/depositors:

shall share pro rata in all grain proceeds remaining after payment of the Trustee's costs and expenses as provided by section

557(h). Such subordination of Bank's lien renders its secured claim valueless and relegated to an unsecured non-priority status. Allowed grain depositor claims are, respectively, accorded section 507(a)(5) priority with respect to the amount remaining after the pro rata distribution of the grain proceeds.

*Id.* at 315.

On appeal, the district court affirmed the bankruptcy court's decision in *First Nat'l Bank of Smith Center, Kan. v. Nugent*, 72 B.R. 528 (D.Kan.1987). The district court, however, examined the situation in a different light than did the bankruptcy court. The district court believed that "[r]ather than a controversy regarding priorities in the distribution of proceeds, the issue before the court is one of ownership rights to the grain/proceeds." *Id.* at 530. The court examined Kansas law to determine the ownership rights to the grain/proceeds and opined that:

[W]here a deficiency exists in the warehouse inventory such that all receipts and tickets of grain depositors/owners cannot be satisfied, the warehouseman cannot claim any ownership interest in the commingled mass until the other ownership interests of grain depositors/owners have been met. The Bank's secured claim exists to the extent of the "creditor's interest in the estate's interest in such property." 11 U.S.C. § 506(a). In the present case, the debtor/warehouseman lacked any ownership interest in the commingled grain because of the extent of the established deficiency. Consequently, the bankrupt estate does not include an ownership interest in the commingled grain which would entitle the secured claim asserted against any such interest to share pro rata in the distribution of the proceeds from the grain sale.... When the Bank stepped into the debtor's shoes as to the commingled grain, it acquired no ownership interest.

*Id.* at 530–31. In so ruling, the district court found that it was unnecessary to discuss the judicial construction given by the bankruptcy court to the 1984 Bankruptcy Code amendments. *Id.* at 531. *See also In re Bucyrus Grain Co., Inc.*, 78 B.R. 296 (Bankr.D.Kan. 1987) (bankruptcy court agreed with the district court's analysis in *Nugent* when ruling that because the grain in the debtor's grain elevator was the property of the grain depositor and because the bankruptcy estate did not include an ownership interest in the grain, interest earned on proceeds from the sale of the grain was not property of the bankruptcy estate, but belonged to the grain depositor).

Two bankruptcy courts have expressed disagreement with the bankruptcy court's analysis in *Esbon*. *In re Hawkins Co., Ltd.*, 104 B.R. 317, 319 n. 1 (Bankr.D.Idaho 1989) ("Despite the rationale of *In re Esbon Grain Co., Inc.*, 55 B.R. 308 (Bankr.D.Kansas, 1985), there are no substantial substantive provisions contained in 11 U.S.C. § 557, aside from facilitating the conclusion the grain must be considered as property of the estate."); *In re Bearhouse, Inc.*, 84 B.R. 552, 565–66 (Bankr.W.D.Ark.1988):

Ladd Farms argues that 11 U.S.C. §§ 507(a) and 557 grant to producers of grain a priority over all other owners of commingled fungible goods. Ladd Farms argues alternatively that its claim to the soybean proceeds is superior to the claim of NBC because NBC did not give value for the negotiable warehouse receipts it possesses.

Ladd Farms has cited the case of *In re Esbon Grain Co., Inc.*, 55 B.R. 308 (Bankr. D.Kan.1985), *aff'd*, 72 B.R. 528 (D.Kan. 1987) in support of its claim of priority under §§ 507(a), 546 and 557.... [T]his Court is not persuaded by the bankruptcy court's reasoning in *Ebson* [sic] because there is absolutely nothing in the Bankruptcy Code which can reasonably be construed to establish priorities among owners or lienholders of commingled fungible goods.

The courts in *Hawkins* and *Bearhouse* ruled that state law rather than the Bankruptcy Code determined the character and priority of ownership claims to the grain. *Hawkins*, 104 B.R. at 319; *Bearhouse*, 84 B.R. at 566. In *Bearhouse* the bankruptcy court determined that under Arkansas law, farmers who produced grain stored by the debtor-warehouseman did not have priority over the warehouseman's creditor who held

warehouse receipts as collateral for preexisting loans and ordered pro rata sharing among the competing warehouse receipt claimants under Ark.Code Ann. § 4–7–207(2) (1987).[2] *Bearhouse,* 84 B.R. at 566–67. In *Hawkins* the bankruptcy court concluded that all claimant-owners of beans stored by the debtor-warehouseman were entitled to share pro rata in the distribution of the beans or proceeds thereof under Idaho Code § 28–7–207(2).[3] *Hawkins,* 104 B.R. at 322. The *Hawkins* court further ruled that the security interest of First Security Bank, claimed by virtue of the debtor's grant of security interests in its property, in the beans would be limited to the debtor's interest in the beans, but reserved for a later time the final determination of the extent of the Bank's lien. *Id.* Neither *Hawkins* nor *Bearhouse* addressed priorities under the Bankruptcy Code in the event that the grain and bean claimants failed to recover the full amount of their claims in the initial pro rata distribution.

4 Lawrence P. King, ed., Collier on Bankruptcy, ¶ 557.01[1] (1994) teaches us that:

> Section 557 is limited in scope. It does not alter state or other applicable nonbankruptcy law relating to the existence of and priority among interests in and claimants to grain and the proceeds of grain. Except in several limited respects, section 557 does not substantively amend the Code, but rather provides for expedited procedure for the determination of an interest in, or abandonment or other disposition of, grain and the proceeds of grain.

Citing *In re Esbon Grain Co.,* Collier further states that "[t]o the extent a producer does not recover the full amount of grain by way of the section 557 expedited procedures, the producer holds an allowed unsecured claim with respect to which section 507(a)(5) provides a $2,000 [now $4000] maximum fifth priority." 3 Lawrence P. King, ed., Collier on Bankruptcy, ¶ 507.04[5] n. 48 (1994).

In this case, there is no question that the proceeds from the sale of the grain and the other grain-related assets constitute property of the Chapter 11 bankruptcy estate under the broad scope of section 541 and fall within the jurisdiction of this Court. *See State of Missouri,* 647 F.2d at 774; *In re Mount Moriah Elevator, Inc.,* 143 B.R. 905, 909 (Bankr.W.D.Mo.1992); *In re Woods Farmers Coop. Elevator Co.,* 107 B.R. 689, 691 (Bankr. D.N.D.1989), *district court reversal on other grounds aff'd by,* 946 F.2d 1411 (8th Cir. 1991). It is also unquestionable that under Missouri law the relationship between the grain depositors and the Childresses was that of bailor-bailee; that actual ownership of the grain remained with the grain producers; and that the Childresses never acquired ownership of the grain and, therefore, ownership of the grain never passed to the Childresses as debtors-in-possession. *See United States v. Luther,* 225 F.2d 499, 504 (10th Cir.1955), *cert. denied,* 350 U.S. 947, 76 S.Ct. 321, 100 L.Ed. 825 (1956); *In re Cox Cotton Co.,* 24 B.R. 930, 933–34 (E.D.Ark.1982) (applying Missouri law), *vacated and remanded on other grounds, Lindsey v. Ipock,* 732 F.2d 619 (8th Cir.1984); *Woods Farmers Coop.,* 107 B.R. at 692; *Royster v. Pittman,* 691 S.W.2d 305, 307 (Mo.App.1985). In *Weinberg v. Wayco Petroleum Co.,* 402 S.W.2d 597, 599 (Mo.App.1966), the Missouri Court of Appeals described a bailment:

> A "bailment" in its ordinary legal sense imports the delivery of personal property by the bailor to the bailee who keeps the property in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed, and the property returned or duly accounted for when the special purpose is accomplished or that the property shall be kept until the bailor reclaims it.

■ Here, each of the grain depositors became tenants in common of their proportionate share of the grain in storage. *See Cox Cotton Co.,* 24 B.R. at 934; Mo.Rev.Stat. § 400.7–207(2) (1994).[4] "A tenancy in com-

---

**2.** Ark.Code Ann. § 4–7–207(2) (1987) mirrors Mo.Rev.Stat. 400.7–207(2) (1994). See infra footnote 4.

**3.** Idaho Code § 28–7–207(2) also mirrors the language of Mo.Rev.Stat. § 400.7–207(2) (1994). See infra footnote 4.

**4.** Mo.Rev.Stat. § 400.7–207(2) states:

mon is defined as a relationship (not an estate) in which the tenants each own an undivided interest in the subject matter and each possess or have the present right to possess the subject matter." *Preston v. United States,* 696 F.2d 528, 535–36 (7th Cir.1982). Pursuant to Mo.Rev.Stat. § 411.491 (1994), which is a provision of the Missouri Grain Warehouse Law:

A warehouseman, in the absence of some lawful excuse provided by this chapter, is bound to deliver the grain upon demand made either by the holder of a receipt for the grain, or by the depositor, if the demand is accompanied with:

(1) An offer to satisfy the warehouseman's lien;

(2) An offer to surrender the receipt, if negotiable, with such endorsements as would be necessary for the negotiation of the receipt; and

(3) A readiness and willingness to sign, when the grain is delivered, an acknowledgment that it has been delivered, if an acknowledgment is requested by the warehouseman. In case the warehouseman refuses or fails to deliver the grain in compliance with the demand by the holder or depositor so accompanied, the burden shall be upon the warehouseman to establish the existence of a lawful excuse for his refusal.

■ In *State of Missouri,* 647 F.2d at 774–75, the Eighth Circuit Court of Appeals stated that "a bankruptcy court must administer the debtors' limited interest [in this case the bankruptcy estate's limited interest] consistent with the ownership rights of holders of documents of title under Missouri law." Under Missouri law, the grain claimants are bailors who, under normal circumstances, would be entitled to delivery of their stored grain from the Childresses upon a proper demand. In the event that there would be an insufficient amount of grain to satisfy the demands of all of the grain claimants, each claimant would receive its pro rata share. *See Preston,* 696 F.2d at 536; *Luther,* 225 F.2d at 505. In this case, bankruptcy has intervened on the eve that the bond proceeds, proceeds from the sale of grain, and other grain-related assets were to be distributed to the grain claimants by the Department.

In bankruptcy law, "[i]t is well settled that where property is in the bankrupt's hands as a bailee, the trustee [or debtor-in-possession] also holds the property in the same capacity, and the bailor is entitled to recover his property from the trustee." *DeVita Fruit Co. v. FCA Leasing Corp.,* 473 F.2d 585, 588 (6th Cir.1973). *See also Cattle Owners Corp. v. Arkin,* 252 F.Supp. 34, 47 (S.D.Iowa 1966) (" '[I]t is well settled that absent state statutory enactment to the contrary, if the property is in a bankrupt's hands as bailee or agent, the trustee holds it as such, and the bailor or principal may recover the property or its proceeds.' "); *In re Zwagerman,* 115 B.R. 540, 547 (Bankr.W.D.Mich.1990), *aff'd,* 125 B.R. 486 (W.D.Mich.1991) (same); *Woods Farmers Coop.,* 107 B.R. at 692 (same); *In re MCZ, Inc.,* 82 B.R. 40, 42 (Bankr.S.D.Tex. 1987) (same); *In re STN Enter., Inc.,* 47 B.R. 315, 318 (Bankr.D.Vt.1985) (same); *In re Ralph A. Veon, Inc.,* 12 B.R. 186, 188 (Bankr.W.D.Pa.1981) (same).

■ Although the legislative history of sections 507(a)(5) and 557 is enlightening, the Court finds nothing in the plain language of section 557 that sets forth any priorities between grain producers and other creditors of the debtor.[5] However, the grain claimants are bailors under Missouri law and well established bankruptcy law provides that each

Fungible goods so commingled are owned in common by the persons entitled thereto and the warehouseman is severally liable to each owner for that owner's share. Where because of overissue a mass of fungible goods is insufficient to meet all the receipts which the warehouseman has issued against it, the persons entitled include all holders to whom overissued receipts have been duly negotiated.

5. The United States Supreme Court has repeatedly said that courts are to follow the plain meaning of the bankruptcy statutes. *See, e.g., Rake v. Wade,* —— U.S. ——, ——, 113 S.Ct. 2187, 2192, 124 L.Ed.2d 424 (1993); *Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. Partnership,* —— U.S. ——, ——, 113 S.Ct. 1489, 1494–95, 123 L.Ed.2d 74 (1993); *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); *Patterson v. Shumate,* 504 U.S. 753, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992).

grain claimant is entitled to recover its property or its proceeds from the trustee or debtor-in-possession. If a grain claimant is unable to fully recover the grain or grain proceeds because of shortages, section 507(a)(5)(A) clearly gives priority to the grain claimant for the first $4000 of the loss suffered as a result of the shortage. Any loss over $4000 will be satisfied in the same manner as other general unsecured creditors by pro rata sharing in the distribution of the estate.

The Childresses contend that this situation is controlled by *In re Mount Moriah Elevator, Inc.*, 143 B.R. 905 (Bankr.W.D.Mo.1992), and the Court must deny the Department's motion to lift the automatic stay. This Court totally agrees with the holding and the reasoning of *Mount Moriah.* The circumstances in *Mount Moriah,* however, are distinguishable from the present situation. In that case, the Missouri Department of Agriculture (MDA) took possession of the debtor's grain elevator, liquidated the grain-related assets, and deposited the proceeds in an interest-bearing escrow account. Thereafter, the debtor filed bankruptcy under Chapter 7 of the Bankruptcy Code. The Chapter 7 Trustee filed a complaint for turnover of the funds held by the MDA. The MDA moved to dismiss the complaint pursuant to the Eleventh Amendment to the United States Constitution. The MDA also filed a motion to lift the automatic stay to allow it to proceed with distribution of funds held by it. The MDA argued that pursuant to state regulatory procedures, all proceeds held by it should be distributed first to the holders of the grain claims pro rata; that the funds were not property of the bankruptcy estate; and that the automatic stay was not applicable under section 362(b)(4). The bankruptcy court rejected all of the MDA's arguments; sustained the Trustee's complaint for turnover of the funds, with the exception of the certificate of deposit proceeds; and denied the motion to lift the automatic stay.

The bankruptcy court determined that the proceeds from the liquidated assets were property of the bankruptcy estate, that the Bankruptcy Code distribution scheme preempted any inconsistent state regulatory procedures, that section 362(b)(4) was not applicable, and that the Eleventh Amend-ment did not bar the Trustee's turnover action. *Id.* at 909–12. In so ruling, the bankruptcy court stated that:

> The grain here in question is not specifically owned by, or identifiable to any particular grain producer. Nor is it owned by the state. Therefore, it can only be an asset of the debtor's estate, to be liquidated by the trustee and distributed to creditors.... To say that the assets being held by the Department are not assets of the estate within the jurisdiction of this Court would thwart the Congressional intent to provide a meaningful and expedient process by which interests in such assets are to be determined under section 557.

*Id.* at 909. The bankruptcy court recognized that it " 'must make the final determination of property interests after full presentation of the evidence.' " *Id.* (quoting *State of Missouri,* 647 F.2d at 774.). In *Mount Moriah* the Department had yet to determine the allowability of grain producer claims, which would have duplicated the process used by the bankruptcy court in allowing claims. *Id.* Here there is a final order entered after a hearing at which the debtors and their counsel participated and from which they filed no appeal.

Here, in contrast, the property interests in the funds being held by the Department are known. The claims of the grain producers were verified during the state insolvency proceedings. The Childresses do not dispute the amount of any grain producer's claim listed in their bankruptcy schedules. After proper notice of the motion, none of the secured creditors, nor any other creditors, have objected to the Department's motion to lift the automatic stay. No creditor, excluding the grain claimants, claims an interest in the funds currently in the possession of the Department. Further, in *Mount Moriah* the bankruptcy court was not presented with the argument that because of the bailment relationship between the grain claimants and the debtor pursuant to Missouri law, the grain claimants would be entitled to recover the grain or the grain proceeds from the bailee/debtor under bankruptcy law. In addition, in *Mount Moriah* 95% of the unsecured claims represented debts due to farmers and the claims to be paid would be substantially the same whether distribution was made by

the bankruptcy trustee or the MDA. *In re Mount Moriah Elevator, Inc.,* 146 B.R. 451, 453 (Bankr.W.D.Mo.1992).

The Court finds that cause exists under 11 U.S.C. § 362(d)(1) to lift the automatic stay to allow the Department to distribute the funds in its possession to the grain claimants listed in the Childresses' bankruptcy schedules in accordance with an appropriate state court order. The Court further determines that the automatic stay should be lifted because the Childresses do not have any equity in the funds and the Childresses have failed to show that the funds are necessary to an effective reorganization. *See* 11 U.S.C. § 362(d)(2)(A) and (2)(B). The Court will grant the Department's motion to lift the automatic stay.

### CONCLUSION

Based on the above discussion, the Missouri Department of Agriculture's motion to lift the automatic stay is GRANTED.

The foregoing Memorandum Order constitutes Findings of Fact and Conclusions of Law as required by Fed.R.Bankr.P. 7052.

SO ORDERED.