**In re Kenneth R. MICKELSON and Mary Jean Mickelson d/b/a Mickelson Seed Company, Debtors.**

**Bankruptcy No. 95–30460.**

United States Bankruptcy Court, D. North Dakota.

Feb. 20, 1996.

Kip Kaler, Fargo, ND, for Trustee.

Joseph Turman, Fargo, ND, for Pete and Curtis Haman.

George Ackre, Cando, ND, for Debtors.

Shane Goettle, Minot, ND, for WEJCO, Inc.

Lynn Jordheim, Fargo, ND, for USA/IRS.

Wayne Drewes, Trustee, Fargo, ND.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This matter is before the court on the trustee's objection to claims (filed December 21, 1995) to a number of claims filed in connection with this case. Although the Debtor was involved in certain aspects of the grain business, none of the claims are against grain proceeds. All are unsecured claims of individuals, farmers and businesses, who did business with the Debtor. The principal issue is whether any of the claimants are entitled to priority under § 507(a)(5)(A). It is the trustee's position that, owing to the nature of the Debtor's business, and the type of transactions involved, none of the claims qualify for priority treatment. A hearing was held on February 8, 1996.

The Debtor, Ken Mickelson, resides in Rolla, North Dakota where he owns and operates an unincorporated business known as Mickelson Seed Company. Commencing operations in 1990, his company engaged in two aspects of seed preparation. It bought grain from farmers, conditioned it and resold it in the market as seed for planting. It also custom conditioned seed for farmers—taking the farmer's seed in, treating it with fungicide and returning it to the farmer. The business was expanded in 1991 to include the sale of various types of equipment related to grain drying. The company also acted as agent for the sale of certain types of farm chemicals.

Physically, the company's seed plant consists of a metal building with treating equipment, a scale and a warehouse for the storage of bagged seed and equipment. Ten grain bins are on site with total storage capacity of 30,000 bushels.

The Debtor's business was not licensed by the state of North Dakota as a public warehouse and according to the debtor, he did not accept grain for storage. He did, however, purchase grain from farmers and re-sell it to the public, to other farmers, and other seed companies.

Section 726 providing for the distribution of estate assets, allows for payment first to the nine priority classes set forth in § 507(a), followed by distribution to general unsecured claimants. The fifth priority under § 507(a)(5)(A) allows payment up to $4,000 of the unsecured claims of persons engaged in the production or raising of grain, as defined

in § 557(b) against a debtor who owns or operates a grain storage facility, as defined in § 557(b), for grain or the proceeds of grain. Section 507(a)(5)(A) cannot be understood without reference to § 557, and understanding the relationship and reasons prompting their enactment in 1984.

On its face, § 507(a)(5)(A) sets out three criteria which must be established for priority treatment:

1. The claim must be by a person engaged in the production or raising of "grain" as defined in § 557(b)(1).

2. The claim must be for grain or proceeds of grain.

3. The claim must be against a debtor who owns or operates a "grain storage facility" defined by § 557(b)(2) as a site or physical structure regularly used to store grain for producers or to store grain acquired from producers for resale.

## NON–GRAIN RELATED CLAIMS

**1. *Claims arising from the sale of fuel oil, advertising, certification, services, and the like.*** Claims arising from the sale of product and services to the debtor for which payment was not received are not claims qualifying for priority treatment under § 507(a)(5)(A) or any of the other provisions of § 507. They are not claims for grain or proceeds of grain. Claims No. 4, 7, 16, 18, 37 and 44, are denied priority status and are allowed treatment as general unsecured claims.

**2. *Claims by creditors who purchased equipment from the debtor.*** Claims by creditors who purchased grain drying equipment from the debtor, paying for the same in whole or part but not receiving the equipment are not claims amenable to priority treatment under § 507(a)(5)(A) because they are not claims for grain or proceeds of grain. Tom Voller, claim No. 83, argues for priority treatment alternatively under § 507(a)(6). This section pertains to the prepayment of money in connection with the purchase of goods for personal, family, or

household use. Voller's claim relates to grain drying equipment which the court does not regard as qualifying for § 507(a)(6) treatment. Claims No. 45, 51, 75, and 83 are denied priority treatment and are allowed treatment as general unsecured claims.

**3. *Wage claims.*** The claims of Jon Halone, Claim No. 73, and Kurt Carpenter, Claim No. 87, are for labor. Priority treatment under § 507(a)(3)(A) is available only where the unpaid wages or salaries including vacation pay were earned within 90 days prior to the petition date. From the respective proofs of claims, it appears both claims fall outside the 90–day period. Accordingly, Claims No. 73 and No. 87 are denied priority treatment and allowed treatment as general unsecured claims.

## GRAIN–RELATED CLAIMS

1. *Seed purchased from the debtor.* A number of claims are presented by individuals and other seed companies who purchased seed from the debtor by making a pre-payment, expecting but not receiving delivery of the product.[1] Of these, Claim No. 30 of Farmers Union, Claim No. 47 of Ross Seed Co. and Claim No. 53 of Gold Country Seeds fail to meet the first element of § 507(a)(5)(A) in that they are not entities engaged in the production or raising of grain.

2. *Grain purchases by the debtor.* The claims of Kevin Archibald, Claim No. 76, that of Wayne Johnson, Claim No. 89 (replacing No. 81) and that of Pete Haman, Claim No. 85, stem from the purchase of grain by the Debtor for which the respective claimant was not paid. Each of these individuals are farmers engaged in the production of grain. No appearance was made by Archibald and little can be gathered from his proof of claim except to conclude that he delivered durum seed valued at $4,000 to the Debtor for which he was not paid. Johnson, testifying through affidavit, stated that he marketed grain through the Debtor in the same fashion he would have with any other elevator or storage facility. He delivered grain to the Debt-

---

**1.** Claims No. 3, 19/62, 20, 27, 29, 30, 31, 32, 33, 35, 36, 46, 47, 48, 49, 50, 53, 55, 56, 57, 58, 60, 63, 64, 66, 68, 70, 71, 72/78, 74, 77, and 82.

or because of a better price. There was a security interest taken in 12,000 bushels but whether or not it was ever perfected is unknown. There is no evidence of such. There is also no evidence suggesting that the transaction was anything but a straight forward purchase of grain by the Debtor.

Haman was a long-time customer of the Debtor both buying seed and other products from him and, in turn, selling the Debtor grain. According to the Debtor's testimony, he never acted as a broker or held himself out to be a broker of grain but did purchase grain for his own inventory, later selling it as seed to others. In Haman's case, the Debtor purchased grain from Haman and a short time later sold it to an elevator. The Debtor stated that this only happened when he had overbought grain needed for seed purposes. There is no evidence suggesting the Debtor accepted grain for storage or that he accepted grain in bailment for resale. Both Johnson and Haman, apparently acknowledging that they *sold* grain to the Debtor, take the position that a § 507(a)(5)(A) priority does not require a bailment situation but extends to anyone who sold grain and has not been paid for it. In their view, both a bailor/bailee and a buyer/seller relationship qualify for priority treatment under this section.

Section 507(a)(5)(A) is symbiotic of § 557, both having been born out of the crucible of the farming crisis of the 1980's. The few cases applying § 507(a)(5)(A) have placed considerable weight on the legislative history and the problems seen by Congress as necessitating their enactment. Although there was apparently no legislative history specifically attributable to these two sections, there was considerable comment regarding their 1983 counterparts found as §§ 236, 235, and 237 of the Omnibus Bankruptcy Improvements Act of 1983 passed by the Senate as S. 445. Senate subcommittee testimony focused on the problem of recovering farm products located in storage facilities:

(3) the requirements of present law which mandate that owners of crop assets held by the debtor solely on the basis of his status as a bailee must share grain assets held by the trustee in bankruptcy on a pro rata basis with any creditor holding a security interest in assets of a similar type which are owned by the debtor, such that the bailors of such storage contract crop assets have the value of their property diminished for the benefit of such creditors when there is a shortage of produce on hand;

(4) the unprotected status, as unsecured creditors in bankruptcy, of farmers who have sold crops to a farm produce storage facility but have not received payment for that crop;

(5) the reluctance of some courts to accept warehouse receipts and scale tickets, the principle [sic] documents used in warehouse business to establish record of ownership of crop assets stored in warehouse facilities on bailment contracts, as evidence of ownership in bankruptcy abandonment proceedings; ...

S.Rep. No. 98–65, 98th Cong., 1st Sess., p. 25, The Omnibus Bankruptcy Improvements Act of 1983, report of the Committee on the Judiciary United States Senate. There is an obvious correlation of paragraphs (3) and (5) with 1984 sections 557 and 507(a)(5). The Senate report further states that the Committee bill would accomplish the following to alleviate the above-described problems:

. . . . .

(2) The bill would require the court to distribute grain assets or the proceeds of such assets first to producers who have merely stored their grain in such a facility upon a contract of bailment;

. . . . .

(5) The bill contains measures which would strengthen present provisions of the Code allowing a right of reclamation to producers who have sold goods to a debtor in bankruptcy who have not received payment;

(6) The bill contains measures requiring the bankruptcy court to accept valid warehouse receipts and scale tickets as proof of ownership of crop assets possessed by the debtor upon contracts of bailment where they were issued for that purpose;

. . . . .

(8) The bill grants farm producers a priority position in the distribution of assets of the bankrupt to general unsecured creditors when those farm producers have suffered a loss as a result of the sale or conversion of farm produce to or by a debtor operating a storage facility, after trustee and court expenses, wages of employees, and pension plan payments.

*Id.,* at 26. Once again there is an identification of those comments with the 1984 amendments: paragraphs (2) and (6) with § 557; and paragraph (8) with § 507(a)(5). Paragraph 5 pertains to the reclamation rights now codified in § 546(d). The Bill referred to in the above Senate report was subsequently passed by Congress as the 1984 Amendments.

 Courts have never construed § 507(a)(5)(A) standing alone, to accord *sellers* of grain a priority claim. Rather, the priority right granted by § 507(a)(5)(A) is to be regarded as an essential ancillary to § 557. The intent of § 557 was to prevent "forced sharing" by a producer/depositor with secured lenders. It addresses those bailment situations where producers had deposited grain with a grain storage facility for storage and/or resale. Always, however, title remained in the producer. Upon the storage facility's bankruptcy, the court could then provide for expedited distribution of the grain back to the producer who held title. If the quantity of grain held exceeded 10,000 bushels, then the trustee is to sell it with the proceeds being distributed to title holders. 11 U.S.C. § 557(i). Section 507(a)(5)(A) comes into play when there is insufficient grain or proceeds as a result of the trustee's sale for immediate distribution back to the producer. To the extent a producer has not recovered the full amount of *his grain* pursuant to § 557, he is entitled to an allowed unsecured claim with fifth priority pursuant to § 507(a)(5)(A). *In re Childress,* 182 B.R. 545 (Bankr.W.D.Mo.1995); *In re Esbon Grain Co., Inc.,* 55 B.R. 308 (Bankr.D.Kan. 1985). None of the grain-related claimants

stored grain with the Debtor. Of the three who sold grain to the Debtor, none can claim to have retained title. For them to have a right to a § 507(a)(5)(A) priority, they must first have been entitled to recover the grain itself or, where it has been sold by the trustee pursuant to § 557(i), the proceeds. This is the genesis for criteria number 2 noted above—the claim must be a title right for "grain or proceeds of grain." The § 507(a)(5)(A) reference to "proceeds" does not mean proceeds due a person as payment for grain *sold* to a grain storage facility where title has passed to the facility as purchaser.

Thus, even if the court were to conclude that the Debtor is a grain storage facility, which does not appear established by the evidence,[2] the grain-related claimants would still fail to qualify as § 507 priority claimants.

For these reasons, those claimants who purchased seed from the Debtor but who did not receive the product (Claims No. 3, 19/62, 20, 27, 29, 30, 31, 32, 33, 35, 36, 46, 47, 48, 49, 50, 53, 55, 56, 57, 58, 60, 63, 64, 66, 68, 70, 71, 72/78, 74, 77, and 82) are denied priority treatment and are allowed treatment as general unsecured claims. Similarly, the Claims of Archibald, Johnson, and Haman (Claims No. 76, 89, and 85) are denied priority treatment and are allowed treatment as general unsecured claims.

**SO ORDERED.**

---

**2.** Although the debtor does have capacity for storage, the evidence does not establish that it was "regularly" used for the storage of producers' grain. Characterization of an entity as a "grain storage facility" for purposes of § 557 is not determined exclusively by whether it was a licensed or bonded warehouseman under applicable state law. This court is of the view in this regard that the factual circumstances carry the most weight.